SAHR *v.* BIERD.

AUTOMOBILES—MINOR PASSENGER—NEGLIGENCE—INTERSECTIONS—REQUEST TO CHARGE—SPEED—ZIGZAGGING CAR.
   Plaintiff, a 10-year-old boy in westbound car, driven by his one-armed father on a through highway in broad daylight after having consumed some beer, *held*, entitled to a new trial, because of trial court's failure to give requested instruction to the effect that if jury found southbound defendant motorist had driven out into the intersection in the path of vehicle occupied by plaintiff, then defendant was guilty of negligence as a matter of law and his conduct at least 1 of the causes of the accident and plaintiff's injuries, where testimony shows defendant observed the westbound car some 250 to 300 feet away approaching the intersection at estimated speed of 80 miles an hour and zigzagging across the road.

REFERENCES FOR POINTS IN HEADNOTES
5A Am Jur, Automobiles and Highway Traffic § 1092.

Appeal from Saginaw; Huff (Eugene Snow), J. Submitted June 10, 1958. (Docket No. 8, Calendar No. 47,413.) Decided October 13, 1958.

Case by Kenneth Sahr, a minor by his next friend, against Jack M. Bierd for personal injuries sustained in automobile collision. Verdict and judgment for defendant. Plaintiff appeals. Defendant cross-appeals. Reversed and remanded for new trial.

*van Benschoten & van Benschoten,* for plaintiff.

*Heilman & Purcell,* for defendant.

SMITH, J. Here we have an automobile accident at the intersection of 2 country roads. It happened in broad daylight. The roads were clear and dry. A jury verdict was returned for defendant. Plaintiff asserts error, pointing to the court's refusal to submit 2 special questions to the jury, to the court's refusal of the charge that if upon the facts shown the defendant drove out into the intersection he was guilty of negligence as a matter of law, and to the court's inclusions of instructions upon intervening negligence when nothing had intervened. The case will be reversed. If defendant in truth drove out into the intersection under the conditions presented he was guilty of negligence as a matter of law and the jury should have been so instructed.

The inclusion of the special questions, and the controversy over their use, compels us, as well, to examine in detail this cumbersome procedural device which came into the law to lessen the peril of the jury's attaint. It was made statutory at an early time in this jurisdiction[1] and has since been embodied in our court rules.[2] It is prolific of disagree-

---

[1] See Rev Stat 1846, ch 103, § 57.
[2] Court Rule No 37, § 6 (1945).

ment, dissent (see our recent division in *Richards* v. *Birmingham School District*, 348 Mich 490), and distinctions so dubious that Mr. Justice Hart of the supreme court of Ohio (*McNees* v. *Cincinnati Street R. Co.*, 152 Ohio St 269, 284 [dissent] [89 NE2d 138, 146]) referred to them as metaphysical. Viewing the procedure in operation we are not impressed with its utility.

The plaintiff was a 10-year-old boy. He was riding in a Chrysler automobile being driven by his father in a westerly direction on Hess road, a 2-lane, hard-surfaced, east and west, through highway. There is testimony that the father had had some beer prior to the accident. He had a restrictive driver's license only, since he had but one arm, and was required to have a knob on his steering wheel.

Defendant Jack Bierd was driving his Ford south on Towerline road. This also was a hard-surfaced, 2-lane road, running generally north and south. A stop sign at the Hess-Towerline intersection required traffic on Towerline to stop before entering Hess.

It is undisputed that the 2 cars collided. As to how and why they collided the parties differ. Plaintiff asserts that the defendant turned left through the intersection in the path of plaintiff's oncoming car and that the collision actually occurred in the northeast corner of the intersection "where defendant had no right to be." Defendant, however, testified that he came to a full stop "about even with the culvert, which was 2 or 3 feet off Hess," and that he was standing still when hit and had not entered the intersection.

Appellant first asserts error in the refusal of the trial court to submit to the jury 2 special questions:

1. "Did the collision occur on the northeast corner of the intersection of Hess and Towerline road as claimed by the plaintiff?

2. "Did the collision occur on Towerline road north of Hess road as claimed by the defendant?"

In support of his claimed right to the submission of such questions, appellant cites to us CL 1948, § 618.39 (Stat Ann § 27.1019), providing as follows:

"In all cases where an issue of facts is tried before any court of record, the court shall at the request in writing, of the counsel of either party, instruct the jury if they return a general verdict, also to find upon particular questions of facts, respecting which the issue is joined, to be stated in writing, and shall direct a written finding thereon: Provided, Such special questions shall not exceed 5 in number, and shall be each in single, short sentences, readily answered by yes or no. The special verdict, or finding, shall be filed with the clerk, and entered upon the minutes, and when any special finding of facts shall be inconsistent with a general verdict, the former shall control the latter, and the court give judgment accordingly."

Thus appellant relies upon the "special questions" statute, also a part of Court Rule No 37, § 6 (1945), rather than the "special verdict" section of the court rules, section 7 of Rule 37. As Justice BLACK has pointed out in *Richards* v. *Birmingham School District,* 348 Mich 490, 512, 514, these sections are not to be confused. Section 6 (special questions, or special interrogatories) is an outgrowth of an ancient practice. Section 7 (the rule-authorized special verdict) is a modern device, urged by the leading students of our generation,[1] espoused by distinguished judges,[2] made a part not only of our State practice

---

[1] See Sunderland, Verdicts, General and Special, 29 Yale LJ 253; Green, A New Development in Jury Trial, 13 ABAJ 715; Lipscomb, Special Verdicts under the Federal Rules, 25 Wash ULQ 185.

[2] Nordbye, Use of Special Verdicts under Rules of Civil Procedure, 2 FRD 138; Frank, J., in *Skidmore* v. *B. & O. R. Co.* (CCA), 167 F2d 54 (certiorari denied, 335 US 816 [69 S Ct 34, 93 L ed 371]). Our debt to the exhaustive analysis of this famous judge must be affirmatively stated, and with emphasis.

but of the Federal practice as well,[3] commended by those who have employed it,[4] yet permitted by us of the profession to gather dust in the back room. Meanwhile the jury function, guaranteed us by the Constitution, is permitted slowly to break down under the weight of burdens far beyond its capabilities, as the numbers of the jury-waived cases now so eloquently attest. We have too much faith in the jury function to acquiesce tacitly in its gradual elimination.

The problems confronting us in this case cannot be answered upon authority and principle without an examination of the origins and purposes of the special practice which it is here sought to employ. Behind the rule under examination we have one of the darkest of the common-law doctrines, that of the attaint of the jury. This, as Thayer tells us,[5] was for centuries the great check upon the jury. If, upon appeal to a grand jury, the verdict of the first jury was found to be erroneous (even if "based upon a misconception of a nice point of law," Morgan, *supra,* p 576) the first judgment was reversed and (3 Blackstone, Commentaries, \*404) "the judgment by the common law was, that the jurors should lose their *liberam legem* (free law) and become forever infamous; should forfeit their goods and the profits of their lands; should themselves be imprisoned, and their wives and children thrown out of doors; should have their houses razed, their trees extirpated, and their meadows ploughed; and that the plaintiff should be restored to all that he lost by reason of the unjust verdict."[6]

---

3 Rule 49, subd (a) of the Federal Rules of Civil Procedure, adopted in accordance with 28 USCA (1952), § 2072.

4 See Driver, The Special Verdict—Theory and Practice, 26 Wash L Rev 21.

5 Thayer, Evidence (1898), p 140; see, also, Morgan, A Brief History of Special Verdicts and Special Interrogatories, 32 Yale LJ 575.

6 See, also, Co Litt, 294.b.—REPORTER.

The obvious unfairness to the jury of such procedures resulted in their being permitted to bring in a special verdict at a very early period in the common law. (Scott, Fundamentals of Procedure, 95.) They merely found the facts in issue, the court deciding on the legal effect of such facts. A primary difficulty with the common-law special verdict, however, was the rigid rule that if the judge failed to require the jury to find on every material issue of ultimate fact the verdict could not stand. As Dean Leon Green described it (A New Development in Jury Trial, 13 ABAJ 715, 716):

"When employed, it must be complete; the jury must find all the material facts, disputed and undisputed, and not merely the evidence from which the facts can be inferred, nor mere conclusions. Nothing must be left for the judge to do except pronounce judgment upon the facts found. The changes which have been rung on these requisites are numberless, likewise unintelligent and futile. At bottom the special verdict represents a valuable idea, but as put into operation it has no vitality. To require such excessive exactness of a lay body, or even of lawyers, in the heat of trial, is to demand the impossible. Such requirements cramped the life out of the special verdict. While provision for it is found in most States, it is practically just so much dead weight. Had its development been normal it should have superseded the general verdict centuries ago."

As distinguished from the common-law special verdict the early law* also saw the use of special interrogatories. (This is generally the procedure authorized by statute and Court Rule No 37, § 6, quoted, *supra*.) The answers to the special questions are not (as was the common-law special verdict) used in lieu of a general verdict but rather to explain and to test

---

* 2 Pollock & Maitland, History of English Law (2d ed), 631; *Pierce* v. *Woodward*, 6 Pick (23 Mass) 206, 208.

it. The general charge, with all its length and complexity, and the general verdict, remain in use, the special questions merely revealing how the jury dealt with specific issues. If (it is provided by statute) the special findings are "inconsistent" with the general verdict the former shall control. Here lies the first great difficulty. When, in truth, do we have an inconsistency? Modern courts, in effecting reconciliation between the general verdict and the answers to the special questions, have resort to niceties of reasoning and subtleties of thought that would cause even a medieval logician to blanch. In *McNees* v. *Cincinnati Street R. Co.,* 152 Ohio St 269 (89 NE2d 138), the plaintiff's decedent had suffered a coronary thrombosis while operating one of defendant's buses under adverse conditions, due to equipment casualty, during a heavy fog, and while being pushed by another bus. The special question (as to whether "the cause of Taylor McNees' death" was "the mental strain and excitement of the driving conditions" then prevailing) was answered affirmatively. The general verdict, however, was for the defendant. These were held to be reconcilable by the court on the ground that the special question related only to cause, and that it said nothing of proximate cause. See, also, *LaPointe* v. *Chevrette,* 264 Mich 482. It will not profit us to explore their murky techniques of such reconciliations. The point to be made is that any legal doctrine requiring the final result of a controversy to turn upon what in effect are *two* simultaneous verdicts invites disagreement and discord. We need only to go to the digests for further illustrations. Dean Green's observations, made many years ago in 13 ABAJ 715, 716, are equally applicable today: "Innumerable refinements have been developed in their [the special questions'] use and especially in determining when the general verdict is controlled by the special finding, and all in

all, the practice rather tends to retard than to expedite the disposition of cases, and has not met any wide approval."

In addition to the difficulties encountered by reason of the reconciliation doctrine, the form of the questions themselves has given rise to much litigation. (This difficulty, it is noted, will also be encountered in the modern special verdict procedure authorized in Court Rule No 37, § 7 [1945].) In the case before us appellee, correctly discussing both special questions as governed by the same principles, objects to the first question (relating to the corner of the intersection where the accident occurred) on the ground that answer thereto "would in no manner settle the question as to whether or not such entry was negligent, or whether such negligence, if any, was a proximate cause of the accident." Appellee misconstrues the nature of the answer demanded by the rule. The requirements are that it must be an ultimate fact as distinguished from an evidentiary fact (although this is, obviously, a matter of degree only) and it must have a controlling, rather than a collateral, bearing upon the verdict and issues. *Bennett* v. *Hill,* 342 Mich 754. As to the factual aspect, it is impossible, we know, to frame a comprehensive definition of an ultimate fact, or to draw a precise boundary line between evidentiary facts and ultimate facts, since an ultimate fact in one case will not be so in another. Different issues may be involved. The Hon. Merrill E. Otis, one of our most distinguished Federal judges, in speaking before the judicial conference of the eighth circuit (Improvements in Statement of Findings of Fact and Conclusions of Law, 1 FRD 83, 85, 86) expressed the pertinent factors in these words:

"Requirements 3 and 4 have been stated hundreds of times by appellate courts, scores of times by the

supreme court of the United States. In its wording
the principle is simple. The difficulty in its applica-
tion is in determining what are the ultimate facts in
a given case. It seems to be conceded by all who have
given serious thought to the matter that it is not
possible to form a definition which will be a sure
guide at all times. We know that an ultimate fact
is to be distinguished from mere evidence. The su-
preme court has said that. Old Equity Rule 25, 28
USCA following section 723,* which concerns the
framing of a complaint in equity, makes that distinc-
tion. The distinction is presented in the very word
'ultimate' in the phrase 'ultimate fact.' Perhaps, in
any given case, we may say that a fact which is of-
fered in evidence for the purpose of proving some
other fact is not itself an 'ultimate fact.' Perhaps
we may say as to any fact, whether it has been direct-
ly proved in evidence or is an inference from facts
proved, if it serves the sole function of supporting
(not some other inference of fact) but the final legal
conclusion that either plaintiff or defendant shall
prevail, perhaps we may say as to such a fact, it is
an 'ultimate fact.' It occurs to me that there are 2
tests with which every Federal judge is familiar
which the judge may use to determine whether facts
he is considering for his findings are ultimate facts.
The tests are these. 1. If he were drawing a com-
plaint for the plaintiff in the case before him what
allegations of fact would he make to support the
prayer of his complaint? 2. If the case were a jury
case, what facts would he in his charge require the
jury to find as a basis for a verdict for the plaintiff?
These are the 'ultimate facts' required to support a
judgment for the plaintiff. I consider that often a
finding of 1 ultimate fact (or 2 or 3 ultimate facts at
the most) may be sufficient to support a judgment for
the defendant."

---

* See 28 USCA (1928), Judicial Code and Judiciary, Equity Rules.
Rule 25, referred to, has been incorporated in the Federal Rules of
Civil Procedure, principally in Rules 8, 9 and 10. Section 723, re-
ferred to, is now 28 USCA, § 2071.—REPORTER.

As to the requirement that the answer to a special question be "controlling" of the main issue, we examined this aspect of the problem with care in the opinion on rehearing in *Tyler* v. *Wright,* 188 Mich 561, 567, wherein we held:

"Upon the rehearing in this case, counsel for defendants questioned the rule laid down by this Court for the submission of special questions to the jury. In holding that the trial court was not in error in refusing to submit the proffered questions, it was said in the opinion:

" 'Neither question, standing by itself, calls for an answer which would have been controlling. Under the statute which allows the submission of special questions they must be so framed as to call for an answer which may be controlling of the main issue.'

"We were persuaded by the discussion had upon the rehearing that this construction given the statute (CL 1897, § 10237)* was rather too restricted. While no express construction of this phase of the statute appears to have been made by this Court, we are of the opinion that if the questions proposed, taken singly or as a whole, call for findings which might be controlling of the main issue, they should be submitted by the trial court. The questions in controversy, which are set out in the opinion, taken together, come within this rule, and therefore should have been submitted."

In the case before us the primary issue was whether defendant had pulled into the intersection in the path of the oncoming car and had been there struck, or whether he was struck as he sat helpless on Towerline road without having entered the intersection to any substantial extent. The answers to the special questions proposed dealt directly with this issue and the answers thereto, under the principles above set forth, would be both relevant and controlling. Thus

---

* CL 1948, § 618.39 (Stat Ann § 27.1019) re-enacted a part of CL 1871, § 6026; How Stat 1882, § 7606, as amended by PA 1885, No 15; CL 1897, § 10237.—Reporter.

they were unobjectionable as to content. So much, however, cannot be said for their form. The function of the special question is to determine facts without regard to their effect upon their general verdict, and, hence, upon the results to the litigants. To inform the jury of the correlation of their answers with the claims of the parties litigant is to frustrate the entire purpose of the quizzing. We ruled upon this issue in the case of *Taylor* v. *Davarn,* 191 Mich 243, 251, wherein we said, quoting an earlier case, that:

" 'The object of the statute (CL 1871, § 6026; How Stat 1882, § 7606)* requiring the jury to answer specifically questions giving their conclusions on the fact necessary to be found to entitle a party to recover, was to ascertain whether or not they had found sufficient facts from the evidence to support their general verdict under the law as given them by the court. It is the province of the jury to find these facts from the evidence, without aid or suggestion from the court, and this can never be done if the jury are told in advance what facts are necessary to be found to support the verdict, or what answers to the questions propounded will be consistent therewith, or what they must find in order to answer a question propounded in the negative or affirmative. This practice will make the general verdict control the findings, instead of the findings control the general verdict; and thereby the object of the framers of the statute will be defeated. This was the result of the practice indulged in this case. The effect is to make the court, and not the jury, decide the main issues in the case. *Cole* v. *Boyd,* 47 Mich 98. The special findings of the jury were sufficient to support the general verdict, had the proceedings upon which they were based not been erroneous.' "

See, also, *Anderson* v. *Seelow,* 224 Wis 230 (271 NW 844). The case of *Hormel Estate* v. *Harris,* 348

---

* See footnote on page 362.—REPORTER.

Mich 201, relied upon by appellant, did not purport to rule upon this issue. The questions were, therefore, properly denied.

The confusion existing between section 6 and section 7 procedures (compare, *e.g.*, concurring opinion in *Skidmore* v. *B. & O. R. Co.* [CCA], 167 F2d 54, 70, referring to comparable paragraphs [a] and [b] of Rule 49, Federal Rules of Civil Procedure) may warrant a discussion of the latter in order that its vastly different procedures be thoroughly recognized and appreciated. Both involve the use of special questions. But here the similarity stops. Under section 7 there is no general verdict by the jury and there is no general charge to the jury. The jury merely answers written questions concerning material issues of fact. The court then applies the law and renders judgment. This procedure was framed for reasons well stated by Professor Sunderland in his leading article in 29 Yale LJ 253, 258–260 (Verdicts, General and Special), reading, in part, as follows:

"The peculiarity of the general verdict is the merger into a single indivisible *residuum* of all matters, however numerous, whether of law or fact. It is a compound made by the jury which is incapable of being broken up into its constituent parts. No judicial reagents exist for either a qualitative or a quantitative analysis. The law supplies the means for determining neither what facts were found, nor what principles of law were applied, nor how the application was made. There are therefore 3 unknown elements which enter into the general verdict: (a) the facts; (b) the law; (c) the application of the law to the facts. And it is clear that the verdict is liable to 3 sources of error, corresponding to these 3 elements. It is also clear that if error does occur in any of these matters it cannot be discovered, for the constituents of the compound cannot be ascertained. No one but the jurors can tell what was put into it

and the jurors will not be heard to say. The general verdict is as inscrutable and essentially mysterious as the judgment which issued from the ancient oracle of Delphi. Both stand on the same foundation—a presumption of wisdom. The court protects the jury from all investigation and inquiry as fully as the temple authorities protected the priestess who spoke to the suppliant votary at the shrine. It is quite probable that the law is wise in not permitting jurors to testify as to how they compounded their verdict, for all stability would disappear if such inquiries were open. But it does not follow that there is not some better way of deciding controversies than by means of this mysterious agency. If the compound cannot be subjected to analysis perhaps it can be dispensed with.

"As to the first element in the general verdict, the finding of *facts,* it is much better done by means of the special verdict. Every advantage which the jury is popularly supposed to have over the court as a trier of facts, is retained, with the very great additional advantage that the analysis and separation of the facts in the case which the court and the attorneys must necessarily effect in employing the special verdict, materially reduces the chance of error. It is easy to make mistakes in dealing at large with aggregates of facts. The special verdict compels detailed consideration. But above all it enables the public, the parties and the court to see what the jury really has done. The general verdict is either all wrong or all right, because it is an inseparable and inscrutable unit. A single error completely destroys it. But the special verdict enables errors to be localized so that the sound portions of the verdict may be saved and only the unsound portions be subject to redetermination through a new trial. The morale of the jury also is aided by throwing off the cloak of secrecy, for only through publicity is there developed the proper feeling of responsibility in public servants. So far, then, as the facts go, they can be much more effectively, conveniently and usefully

tried by abandoning the general verdict and substituting the special verdict.

"As to the second element in the general verdict, the *law,* it is a matter upon which the jury is necessarily ignorant. The jurors are taken from the body of the county; and it is safe to say that the last man who would be called or allowed to sit would be a lawyer. They are secondhand dealers in law, and must get it from the judge. They can supply nothing themselves; they are a mere conduit pipe through which the court supplies the law that goes into the general verdict. But while the jury can contribute nothing of value so far as the law is concerned, it has infinite capacity for mischief, for 12 men can easily misunderstand more law in a minute than the judge can explain in an hour. Indeed, can anything be more fatuous than the expectation that the law which the judge so carefully, learnedly and laboriously expounds to the laymen in the jury box will become operative in their minds in its true form? One who has never studied a science cannot understand or appreciate its intricacies, and the law is no exception to this rule. The very theory of the jury and its general verdict is thus predicated upon a premise which makes practically certain an imperfect or erroneous view of the principles of law which are to be compounded into the verdict. The instructions upon the law given by the court to the jury are an effort to give, in the space of a few minutes, a legal education to 12 laymen upon a branch of the law involved in the case. Law cannot be taught in any such way. As to this element, accordingly, the general verdict is almost necessarily a failure.

"As to the third element in the general verdict—the *application of the law to the facts,* we find the same difficulty as in the case of the first element,—a merging of the law into the verdict in such a way that it is impossible to tell how or whether the jury applied the law. They may have applied it in a wholly wrong way, or they may have failed to apply it at all. No analysis of the verdict can be made

which will throw any light on the process. Since the case can ordinarily go to the jury only if a verdict either way is legally possible, whatever the jury does is presumed to be right, and this presumption excludes any inquiry from the jurors themselves. Cases may arise where the verdict shows on its face a failure to properly apply the law, usually as relating to the measure of damages, but in the vast majority of cases the verdict is a complete mystery, throwing a mantle of impenetrable darkness over the operations of the jury. Whether the jurors deliberately and openly threw the law into the discard, and rendered a verdict out of their own heads, or whether they applied the law correctly as instructed by the court, or whether they tried to apply it properly but failed for lack of understanding,—these are questions respecting which the verdict discloses nothing. So far, therefore, as the third element goes, the general verdict is an unknown and unknowable mystery, with the balance of probability against it."

It was to avoid these serious defects in the general verdict procedure that our court rules have embodied section 7 of Rule No 37 (1945), providing:

"Sec. 7. In any civil case, the court in its discretion may at any time, on its own motion or on request of either party, direct the jury to find a special verdict, and in such case no general verdict shall be returned. Such verdict shall be prepared by the court in the form of questions in writing, relating only to material issues of fact and admitting a direct answer, to which the jury shall make answer in writing. Instructions to the jury shall be limited to such matters as are material to the question submitted. Whenever any special verdict shall be submitted to a jury and there is omitted therefrom some controverted matter of fact not brought to the attention of the trial court by request for submission, but essential to sustain the judgment, such matter of fact shall be deemed determined by the court in conformity with its judgment, and the neglect or omission to request a finding

by the jury on such a matter shall be deemed a waiver of a jury trial *pro tanto* and a consent that such omitted fact be determined by the court. The finding or determination of such omitted fact by the court may be reviewed on appeal without any exception thereto."

Under this procedure the jury is not expected to assimilate that mass of abstract law known as the instructions or the general charge. The difficulties with the charge have been known to the profession for years. Dean Green's well-known study, Judge and Jury, examines the problem on page 351 thereof:

"The instructions of a judge to a jury normally relate to the law applicable to the possible findings of facts, stated hypothetically, which are supported by the evidence. In any but the simplest cases, they are long and involved, phrased in terms of the nicest distinctions, capable of being understood only by lawyers, and, more frequently than not, inaccurate. No one seriously claims that they are understood by juries or that they assist a jury in reaching a verdict. For most part they are ritual. Nevertheless, these instructions are the greatest single source of reversible error and both trial and appellate courts would be relieved of their greatest source of annoyance if the general charge could be eliminated from trial procedure."

Thoughtful jurists have been no less outspoken. It was Judge Driver of the Federal bench who put the problem in these terms:

"Appellate courts must assume that the jury has dutifully considered, has understood and has correctly applied the instructions and, therefore, that if the court's statement of the law is in any substantial particular incorrect, incomplete, or inaccurate, the general verdict has thereby been affected. The assumption, of course, is absurd. It is impossible in a few minutes to educate 12 laymen on the law of

a case, embracing, as it often does, complex and technical rules of law, involved exceptions, and finely drawn legal instructions. Many times in my experience the foreman of a jury has sent me a note by the bailiff asking some question which indicated that the jurors did not have even a vague conception of the meaning of the court's instructions." (The Special Verdict—Theory and Practice, 26 Wash L Rev 21, 22.)

Much the same criticism is often voiced by members of the bar. Mr. Leonard O. Thomas, of the Kansas Bar, addresses himself to the subject in his article in 23 U of Kansas City L Rev 194. 195:

"It is interesting to note that, if all juries followed the court's instructions, there would, in the ordinary case, be no purpose whatever in requiring them to answer any special questions. Every question would be answered in accordance with the court's instructions, and there would be no inconsistency between the answers and the general verdict. However, 90 years' experience with the juries' answers to special questions has demonstrated that juries do frequently render verdicts based on passion or prejudice and not in accordance with the instructions. One of the reasons is not the venality of the members of the jury, or their lack of sympathy with the law given by the court, but their inability to understand the instructions. Thus in an ordinary negligence action in Kansas the instructions may number 20 pages or more of complicated rules of exceedingly technical abstract law. It is no wonder that a jury that wishes to render an unbiased verdict is frequently unable to understand what verdict it must render on the facts found. This 90 years of experience in Kansas has led our appellate court to recognize the imperfection in the jury system and to base its affirmance or reversal of a case primarily on the answers to the special questions and not the instruction. Thus, judgments are very seldom reversed in Kansas on the instructions, which state general rules of law only,

but are reversed very frequently on the answers to the special questions."

The section 7 procedure is designed to eliminate this criticism. Under the procedure of this section no general charge is given, although, as noted hereafter, some instruction to the jury as to the law cannot be avoided. The jury, under the procedure, undertakes merely a fact-finding function, and it has been suggested that under the constraint of answering particular fact questions they will adhere more closely to the evidence adduced. As was said by Judge Driver:* "I have reason to believe also that while many jurors will complacently acquiesce in a general verdict they are much more hesitant about subscribing to a special verdict fact finding which they think is not supported by the evidence." Moreover, since the questions presented are not identified with either party, or related to his winning or losing (the court, in fact, not the jury, decides the case) the danger that a verdict will be controlled by bias or prejudice is lessened. The intricacies and chances of error inherent in general instructions (which remain even under the special interrogatories procedure) are avoided. In fact, if the court misapplies the law to the facts it may correct its own error and without the need for a special trial. Moreover, the greatest single source of difficulty with the common-law special verdict has been eliminated. Under the old practice it was required that the jury find all of the material facts in issue. The omission of any would necessitate a new trial. Under the modern practice, however, and that embodied in section 7 of our rules, controverted matters of fact essential to sustain judgment but not brought to the attention of the trial court by requests for submission are

---

* The Special Verdict—Theory and Practice, 26 Wash L Rev 21, 24.

deemed determined by the court in conformity with its judgment, and the omission to request such finding deemed a waiver of jury trial *pro tanto.* Thus has been eliminated the danger of necessity for new trial because of inadvertent omission of findings of some material fact. So far as the appellate tribunal is concerned, the specific findings upon the material issues should simplify and expedite its work.

The special verdict procedure is not, of course, to be thought of as a panacea. The distinction between an ultimate fact and a mere evidentiary fact must still be made. Moreover, the whole process may be defeated simply by an ultraliteral* interpretation of the word "fact" since (once we go beyond such basic facts as those of birth and death) most material facts seem to involve the application to human conduct of legal standards, thus arriving at a material and ultimate "fact" (*e.g.,* of negligence). It may happen, of course, that a case will be so complicated, the application of the law to the facts so involved, that little or nothing would be gained in simplicity by attempting the special verdict procedure. Even in such case, however, the utilization of another modern device, the pretrial procedure, should enable the factual issues to be narrowed to the point where a special verdict might be employed. If this seems impracticable the procedure need not be used, for the rule wisely leaves its application to the discretion of the trial court. It should be noted again, also, that the special verdict procedure of section 7 does not completely eliminate instructions to the jury. To some degree they must have guidance and explanation as to legal terms sometimes necessary to be employed in the questions.

---

* *Cf., Hydraulic Development Corp.* v. *Lake Erie Engineering Corp.,* 2 FRD 174: "It is unnecessary to say that the courts are uniformly disposed to be liberal in applying the rules of procedure as to interrogatories."

Thus difficulties will remain. The problem of the litigated issue has no easy solution. But in the final analysis, whether the special verdict works to simplify the administration of justice and lower its cost will depend upon whether we of the profession want it to work. We would do well, in the light of today's prolific multiplication of boards, bureaus, and commissions, all deciding controverted issues of law (a function nonetheless judicial in fact because sugarcoated with a "quasi") to ponder Professor Sunderland's words of over a quarter-century ago, spoken in Detroit at a joint meeting of the American Bar Association and the Michigan State Bar Association, with reference to our professional attitude towards procedural problems:

"The profession is inclined to take a rather fatalistic attitude, as though rules of practice, especially if hallowed by long observance, were immutable, like the law of gravity, and the public must make the best of them, just as it makes the best of the various forces of nature. But the profession is suffering from the complaisance which affects every monopolistic institution. Instead of expecting commercial, industrial and social relations to adjust themselves to the obsolete equipment with which the judicial establishment does business, the profession should, as it has done in England, scrap a large part of the machinery and provide new devices to correct the defects which have become an intolerable burden upon society."*

The special verdict procedure of section 7 may, indeed, for reasons not anticipated by those responsible for its formulation and adoption (some of whom have heretofore been quoted), prove unworkable in practice in this State. If so it may well be that lessons learned from its attempted employment will point up the need for wiser measures looking towards

---

* An Appraisal of English Procedure, 11 ABAJ 773, 778.

a better solution of the public's (and our) problem. The provisions of section 7, on their face, and in the light of the experience therewith where tried, both in Federal and State courts, would seem to warrant at least a tentative utilization. This Court, in the exercise of its constitutional duties of rule-making and supervision, may be persuaded by the appropriate committees of the bar and of the judicial conference to eliminate section 6 and its statutory base (CL 1948, § 618.39 [Stat Ann § 27.1019]) and, hence, the requirement of general instructions and a general verdict in favor of the discretionarily employable section 7. But let no one delude himself that a mere change in rules will effectuate a change in practice. Unless and until the bench and bar are convinced that only a modernization of ancient practices will halt the flight to lay boards and commissions which has already taken place in great areas of the law the mere adoption of a rule will do nothing. Harris put the matter in "The Rule-Making Power," 2 FRD 67, 72, 73, in these words:

"It is obvious that the court-rule method does not of itself guarantee a flexible and changeable procedure. In fact that method may be one of the best devices to solidify the existing practice. Observe the procedure in Michigan since 1850 and in Colorado for over 25 years after 1913. Procedural changes depend more on the 'will to change' which is held by large numbers of the bench and bar rather than on any particular method of change. In fact experience teaches that formal changes will be of little effect unless accepted with a spirit of change. This requires a clear recognition of the real basis of legal procedure. Primarily it is not found in rules or statutes but in the habits and attitudes of the legal group. Legal procedure is merely the way lawyers and judges do their work. Written rules are an attempt to make those practices articulate. Recognizing this, it is pure fantasy to assume that

a rule of court or statute will by some magical process develop a new system. Any change, whether by court rule or by statute, must come through the willingness of the legal group to adopt new ways of doing things and new attitudes toward those practices."

So much for the procedure sought to be utilized in this case. Appellant's allegations of error, however, do not stop here. His proposed instruction No. 2, which the trial court refused to give to the jury, read, in part, as follows:

"I charge you in this case that if you find that the defendant, Jack Bierd, drove out into the intersection in the path of the vehicle occupied by Kenneth Sahr, then and in that case and under the facts of this case, you will find the defendant, Jack Bierd, guilty of negligence as a matter of law, since such conduct would mean as a matter of law that the defendant's conduct was at least one of the causes of this accident and the plaintiff's injuries. I further charge you that the defendant, in pulling out into such an intersection, has the duty to maintain a look-out and to see and detect any vehicle entering the intersection from the east on Hess road. Under such circumstances, the defendant would be guilty of negligence as a matter of law if you find that he drove into the intersection in the path of the vehicle occupied by plaintiff, and you would then turn to the question of damages since I instruct you as a matter of law that a driving into the intersection by the defendant under the facts of this case, in the path of the vehicle occupied by the plaintiff, would be at least 1 of the causes of the plaintiff's injuries."

An analysis of the factual situation before the court amply justifies the instruction prayed. Defendant admitted that when he had brought his car to a final stop at the intersection, he saw the plaintiff's Chrysler approaching at a distance of from 250 to 300 feet. "I had been driving about 23 years,

and I would estimate its speed at about 80 miles an hour," he testified. It was zigzagging, "going back and forth across the road." There can be no doubt that "under the facts of this case" (as the requested instructions read) "if the defendant, Jack Bierd, drove out into the intersection in the path of" the oncoming driver, who would have covered the intervening distance (if at 300 feet) in approximately 2-1/2 seconds, he would have been guilty of negligence as a matter of law. No reasonable man could conclude otherwise. It is to be doubted, in fact, if a car traveling at 80 miles per hour can be brought to a stop within 300 feet. A widely published figure for stopping at 60 miles per hour (the tables do not go as high as 80 miles per hour) is 336 feet.* We do not, however, place decision on the factor of the testified speed alone. The zigzagging of the car, even at a low rate of speed, should indicate to a reasonably prudent observer that proper control of the oncoming car is for some reason lacking and that entry into its path is fraught with peril. Plaintiff was entitled to the requested instruction.

The defendant cross-appeals on the theory that the court should have granted his motion for a directed verdict made at the close of plaintiff's proofs. At the close of plaintiff's proofs the jury had before it testimony that the car in which plaintiff was riding was traveling from 70 to 80 miles per hour on a bumpy tarvia road, on the wrong side thereof, that he "passed over to the north side of the road," that subsequent thereto "he put on his brakes," witness Arnst stating that "I could hear the noise of the wheels on the pavement. * * * I heard the squeal all the way until the crash." The same witness testified that the Chrysler slewed sideways as it approached the intersection, with the back wheels on

---

* See Driver Education Textbook of American Automobile Association, "Sportsmanlike Driving" (2d ed), p 72.

the (north) edge of the pavement, the front of the car "slightly over the crown of the road or the middle of the road," and that the Ford, at the moment of collision "would be in the same position that the Chrysler was." We need not get into the testimony respecting skid marks, damage to the cars, and other evidence. All of this, viewed as it must be on the motion, in the light most favorable to plaintiff, warrants submission of plaintiff's case to the jury. There was no error in the denial of the motion.

No other error of reversible nature appears. Reversed and remanded for new trial. Costs to appellant.

BLACK, VOELKER, and KAVANAGH, JJ., concurred with SMITH, J.

DETHMERS, C. J., and CARR and KELLY, JJ., concurred in the result.

EDWARDS, J. (*concurring in part*). I concur in reversal for new trial on the last ground stated by Mr. Justice SMITH referring to the court's failure to submit appellant's requested instruction No. 2.