SUDUL v CITY OF HAMTRAMCK

Docket No. 170609. Submitted December 14, 1995, at Detroit. Decided
February 11, 1997, at 9:05 A.M.

Anthony Sudul and his wife, Teresa Sudul, for herself and as next
friend of their children, brought an action in the Wayne Circuit
Court against the City of Hamtramck, William Robinson, David
Donnell, and others for damages that allegedly occurred as a result
of injuries suffered by Anthony Sudul during his arrest by Robinson
and Donnell, Hamtramck police officers. Anthony Sudul alleged
assault and battery and excessive use of force by Robinson and
Donnell and violation of his civil rights by reason of the failure of
the Hamtramck police chief to investigate the events concerning
the arrest. Claims of infliction of emotional distress and loss of
society or companionship were brought on behalf of the children
on the basis of their observation of the assault on their father and
the injuries he allegedly sustained. Teresa Sudul sought damages
for loss of consortium, loss of society or companionship, and inflic-
tion of emotional distress. Because the parties and the court, Kath-
leen J. MacDonald, J., believed that the actions of the police
officers in effecting the arrest were subject to the defense of gov-
ernmental immunity unless the plaintiffs' injuries were the result of
gross negligence by the officers, the claims of assault and battery
and infliction of emotional distress were submitted to the jury
under instructions that required a finding of grossly negligent
behavior by the police officers. The jury returned special verdicts,
finding that Robinson and Donnell had committed assault and bat-
tery by gross negligence against Anthony Sudul, that Robinson and
Donnell had used excess force against Anthony Sudul and had
been deliberately indifferent to his constitutional rights, that Robin-
son and Donnell had inflicted emotional distress by gross negli-
gence with respect to one of the children, that the city had
deprived Anthony Sudul of his federal constitutional rights as a
result of the failure to investigate whether excessive force had
been used, and that Teresa Sudul had suffered loss of consortium
and that she and one of the children had sustained a loss of society
or companionship as a result of Anthony Sudul's injuries. The city,
Robinson, and Donnell appealed.

The Court of Appeals *held*:

The defendants were not accorded a fair trial because it was error to charge the jury with respect to the nonexistent tort of assault and battery by gross negligence. That error so pervaded the jury instructions that it rendered the other special verdicts unsound, requiring reversal of the entire verdict and remand of the matter for further proceedings.

1. The torts of assault and battery require a finding of the necessary element of intent. The jury instructions and the special verdict form with respect to claims of assault and battery permitted the jury to find commission of those torts on the basis of a finding of gross negligence without a finding of the necessary element of intent. The court's instructions constituted legal error and confused the jury regarding the necessary intent for the claims of assault and battery.

2. An individual government employee is not shielded by the governmental immunity statute, MCL 691.1407; MSA 3.996(107), from liability for an intentional tort.

3. Although the use of special verdicts may permit the sustaining of some special verdicts despite a defect with respect to another special verdict, here the flaw in the jury instructions regarding assault and battery by gross negligence tainted the entire verdict. It is impossible to say that the special verdicts concerning excessive force, grossly negligent infliction of emotional distress, and the derivative claims were unaffected by the instructional error. The instructions as a whole did not clearly apprise the jury of the governing law and did not protect the defendants' rights. The instructional error is manifest, is not isolated, and is not harmless. Accordingly, a failure to reverse all the verdicts affected by the instructional defect would be inconsistent with substantial justice.

4. A finding of liability on the part of the city under 42 USC 1983 required a showing that the police chief displayed deliberate indifference as a matter of custom or policy by failing to investigate whether any police officer battered or used excessive force against Anthony Sudul during his arrest. The record does not show that the police chief was deliberately indifferent to Anthony Sudul's Fourth Amendment rights. Nothing in the record shows that the police chief ratified, authorized, or knowingly acquiesced in any misconduct. Rather, the record shows that the police chief had formulated a department policy requiring that any officer who observed visible injuries must report them. To the extent that the desk sergeant failed to comply with that regulation, that failure cannot be attributed to the police chief. The record further fails to show that the police chief failed to enforce the departmental regulations or was aware that those regulations were not being complied with. The

record fails to show that the police chief was aware that excessive force may have been used during Anthony Sudul's arrest until after the plaintiffs' had commenced their action. The failure of the police chief to undertake an independent investigation after commencement of the lawsuit cannot be used to support a claim of deliberate indifference by the police chief. At best, the plaintiffs' proofs established a single incident in which a desk sergeant failed to make the required report, and a single incident cannot establish a custom or policy that demonstrates deliberate indifference.

Reversed and remanded.

MURPHY, P.J., concurring in part and dissenting in part, stated that the special verdicts relative to the claims of assault and battery must be reversed because the court's instruction permitted the jury to return a verdict for plaintiff Anthony Sudul without finding the necessary element of intent; however, that error affected only the special verdict with respect to the claims of assault and battery, leaving the other special verdicts with respect to the use of excessive force, infliction of emotional distress, and loss of society, companionship, and consortium untainted. Further, there was sufficient evidence on the record to support the verdict against the city with respect to the 42 USC 1983 claim.

1. ASSAULT AND BATTERY — INTENT — GROSS NEGLIGENCE — JURY INSTRUCTIONS.

The torts of assault and battery require the finding of the necessary specific intent; instructions that permit a jury to return a verdict of assault or battery without finding the necessary specific intent but rather by finding gross negligence are an error of law.

2. TORTS — INTENTIONAL TORTS — GOVERNMENTAL IMMUNITY.

An individual government employee that commits an intentional tort is not shielded from liability for that tort by governmental immunity (MCL 691.1407; MSA 3.996[107]).

*Thomas E. Kuhn* and *Williams & Youngblood, P.C.* (by *Amos E. Williams*), for the plaintiffs.

*Gault Davison, P.C.* (by *Frederick L. Schmoll, III,* and *Michael J. Gildner*), for the defendants.

Before: MURPHY, P.J., and CORRIGAN and P. D. HOUK* , JJ.

---

* Circuit judge, sitting on the Court of Appeals by assignment.

CORRIGAN, J. Defendants were not accorded a fair trial because the error regarding assault and battery by gross negligence pervaded the jury instructions and rendered the other special verdicts unsound. We reverse and remand for further proceedings consistent with this opinion.

We specifically agree with the discussion in the dissent/concurrence regarding the nonexistence of a tort called "assault and battery by gross negligence." We especially also hold that an individual employee's intentional torts are not shielded by our governmental immunity statute, a proposition that too frequently is mired in confusion. Nonetheless, we disagree with the position taken in the dissent/concurrence on two grounds.

### I. EFFECT OF DEFECTIVE JURY INSTRUCTIONS ON INTEGRITY OF SPECIAL VERDICTS

We part company with the position taken in the dissent/concurrence with respect to the scope of the reversal. While we accept the utility of special verdicts in saving sound portions of a verdict, we nonetheless vacate all the special verdicts in this case because the flaws in the jury instructions regarding assault and battery by gross negligence tainted the entire verdict.

Justice OTIS SMITH observed in *Sahr v Bierd*, 354 Mich 353, 365; 92 NW2d 467 (1958), quoting Sunderland, *Verdicts, General and Special*, 29 Yale LJ 253, 259 (1920):

"The special verdict compels detailed consideration. But above all it enables the public, the parties and the court to see what the jury really has done. The general verdict is either all wrong or all right, because it is an inseparable and

inscrutable unit. A single error completely destroys it. But
the special verdict enables errors to be localized so that the
sound portions of the verdict may be saved and only the
unsound portions be subject to redetermination through a
new trial."

We cannot say that the special verdicts concerning
excessive force, grossly negligent infliction of emo-
tional distress, and the various derivative claims were
unaffected by the instructional error. The instruc-
tional error was not harmless.

After being instructed incorrectly that defendants
could be held responsible for assault and battery if
they were grossly negligent, the jury retired to delib-
erate. Three hours later, the jurors posed several
questions to the court. They first inquired whether
excessive force constituted assault and battery. The
court, with the agreement of counsel, replied that it
did. The court's answer that excessive force was the
same as assault and battery reinforced the original
error that defendants could be liable for assault and
battery by an act of gross negligence.

The court earlier had instructed the jury:

Gross negligence is defined in our state by statute, and it
is defined as conduct so reckless as to demonstrate a sub-
stantial lack of concern for whether an injury results. The
same statute states—grants immunity from tort liability to
police officers performing their duty, provided that the
police officers' actions are not grossly negligent. *This
means that the officers are not liable to plaintiffs for
assault, battery or excessive force unless you find that
their actions were grossly negligent.* [Emphasis added.]

The court then gave the correct definitions of
assault and battery as set forth in SJI2d 115.01 and

115.02. The court further instructed the jury that the City of Hamtramck

> may be liable where if you find that the plaintiffs have been subjected to excessive force in plaintiff's arrest and excessive force was done pursuant to a governmental custom, policy, or practice.

The court also merged the concepts of gross negligence and assault and battery in its instructions regarding compensatory and future damages:

> If you decide that the plaintiffs, Anthony and Bernard Sudul, are entitled to damages, it is your duty to determine the amount of money which reasonably, fairly, and adequately compensate[s] each of them for the elements of damage *which you decide has resulted from the assault, battery and excessive force by the defendants' grossly negligent conduct and/or from the violation of plaintiffs' federal constitutional rights* by each police officer or the city, taking into the account the nature and extent of the injury.
>
> *    *    *
>
> If you decide that the plaintiffs, Anthony and Bernard Sudul, are entitled to damages in the future, it is your duty to determine the amount of money which reasonably, fairly and adequately compensates each of them for each of the elements of damage in the future *which you decide has resulted from the assault/battery and excessive force by the defendants' grossly negligent conduct and/or from the violation of plaintiffs' federal constitutional rights by each of the police officers or the city*, taking into account the nature and extent of the injury. [Emphasis added.]

The verdict form asked specifically whether the officers assaulted plaintiff Anthony Sudul by an act of gross negligence or battered plaintiff Anthony Sudul by an act of gross negligence. As noted, defendants specifically objected on the very ground on which

they have here prevailed—that the tort of assault and battery by gross negligence does not exist.

It is critical to us that this misinstructed jury nevertheless returned verdicts of no cause of action for three of the five individual defendant police officers involved in Anthony Sudul's arrest. The court apparently had earlier directed verdicts for two named individual defendants. The jury found only Officers David Donnell and William Robinson, who pushed Sudul to the ground to handcuff him after he resisted arrest, liable with respect to the claims of grossly negligent assault and battery and excessive force. Moreover, although Chief Alexander Shulhan was named personally as a defendant, the jury did not decide the question of his liability. The record does not account for the disposition of plaintiffs' claims against the police chief. The question of Chief Shulhan's personal liability was not before the jury. Only the City of Hamtramck's liability was before the jury.

We cannot conclude that the instructions as a whole, some correct and some incorrect, clearly apprised the jury of the governing law and protected defendants' rights. The court improperly defined assault and battery, then equated it with excessive force and gross negligence. Where a court gives conflicting instructions, one of which is erroneous, we generally presume that the jury followed the erroneous instruction. *Kirby v Larson*, 400 Mich 585, 606-607; 256 NW2d 400 (1977). Indeed, the jury's subsequent intelligent questions reflected its attempt to understand and follow the court's confusing instructions. The court's instructions permitted the jury to find liability without the requisite finding of intent for assault and battery, then merged an erroneous defini-

tion of assault and battery with the definition of excessive force in response to the jury's explicit question regarding the nature of those torts.

The author of the dissent/concurrence would also recognize a novel tort of grossly negligent infliction of emotional distress, not recognized previously in any reported case. Our Supreme Court has yet to recognize formally the tort of intentional infliction of emotional distress. We doubt that the Supreme Court would recognize such grossly negligent emotional distress where the shocking and outrageous event that the child bystander witnessed may well have been nothing more than a lawful arrest involving the use of reasonable force. On this record, we have serious reservations regarding the correct application of law to facts. These defendants are as entitled as any litigant to deliberations by a jury that has been instructed correctly concerning the law.[1] The instructional error is manifest, is not isolated, and is not harmless. In our view, failure to reverse all the verdicts affected by the defect is inconsistent with substantial justice. *Id.*

---

[1] At various points during trial, both plaintiffs' counsel and the court erroneously stated that the officers could be held liable for their subjective "bad faith" in the use of excessive force, a standard repudiated nearly five years earlier in *Graham v Connor*, 490 US 386; 109 S Ct 1865; 104 L Ed 2d 443 (1989). Instead, the excessive force claim should have been analyzed under an objective reasonableness standard. In our view, the trial court improperly collapsed the excessive force and the assault and battery claims, despite the fact that they involve distinct harms, *Garner v Michigan State Univ*, 185 Mich App 750, 764; 462 NW2d 832 (1990), and failed in its duty to provide clear guidance with regard to the governing law. This failure is manifestly unjust, regardless of whether defendant specifically objected.

## II. MUNICIPAL LIABILITY UNDER 42 USC 1983 FOR THE POLICE CHIEF'S FAILURE TO INVESTIGATE

We disagree that the City of Hamtramck is liable under 42 USC 1983 because its police chief displayed deliberate indifference as a matter of custom or policy by failing to investigate whether any police officers battered and used excessive force against plaintiff Anthony Sudul during his October 1991 arrest. In 42 USC 1983 parlance, Chief Shulhan was a final municipal policymaker whose official conduct must be scrutinized to determine municipal liability. The police chief was not involved personally in the arrest or its aftermath. He never personally investigated plaintiffs' claims. In fact, he apparently did not even know about plaintiffs' claims of excessive force until they filed the instant lawsuit.

To affirm the verdict that the city, through Chief Shulhan, was deliberately indifferent, Judge MURPHY concludes that Chief Shulhan failed to enforce policies regarding excessive force in two ways. First, he failed to enforce unspecified departmental policies to ensure that he had the necessary information to supervise and discipline the officers. Second, he failed to conduct a parallel investigation after the instant lawsuit commenced. Neither ground justifies imposition of liability on the city.

We accept the statements in the dissent/concurrence regarding the governing standards for determination of municipal liability in 42 USC 1983 cases. Liability under 42 USC 1983 must be premised upon more than a municipal employee's status as a tortfeasor. Further, a municipality cannot be liable under 42 USC 1983 on a respondeat superior the-

ory.[2] In our view, the evidence does not show Chief Shulhan's deliberate indifference to Anthony Sudul's Fourth Amendment rights. Viewed in a light most favorable to plaintiffs, the record reflects that the desk sergeant on duty, Sergeant Misiak, failed to inquire about Anthony Sudul's visible injuries, obstructed the family's report, and thus obstructed Chief Shulhan's knowledge of official misconduct. This obstruction is not attributable vicariously to Chief Shulhan.

Nothing in this record shows that the chief ratified, authorized, or knowingly acquiesced in any misconduct. " 'The established law is clear that someone in a supervisory capacity . . . must have at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending employee.' " *Durham v Nu'man*, 97 F3d 862, 869 (CA 6, 1996).

### A. FAILURE TO ENFORCE POLICIES TO INFORM THE CHIEF OF THE MISCONDUCT

Chief Shulhan testified that he *was* apprised of the use of force in the Sudul matter. Officer Peter Garon completed a preliminary complaint report detailing Mr. Sudul's resistance and his physical injuries, in compliance with departmental policy. Accordingly, the departmental policy to report the use of force resulting in physical injury was satisfied. The chief reviewed this report and saw no need to act.

The written departmental policy required that "one who observes visible injuries must make a prelimi-

---

[2] Consistent with *Rushing v Wayne Co*, 436 Mich 247, 268; 462 NW2d 23 (1990), our duty is to determine whether a reasonable jury could have concluded that a deliberate indifference standard is satisfied on the record. In our opinion, a reasonable jury could not find deliberately indifferent municipal misconduct.

nary complaint report." Thus, the chief had formulated policy governing this situation. *Rushing v Wayne Co*, 436 Mich 247; 462 NW2d 23 (1990). Nor did the chief, as the final policymaker, fail to enforce procedures established by this policy. The record demonstrates that Chief Shulhan had conducted six civil rights investigations of officer misconduct in the previous five years. Four investigations resulted in the officer at issue being exonerated, while two resulted in referrals to the Wayne County Prosecutor's Office for prosecution. Hence, the custom, policy, or practice of the Hamtramck police chief was not to engage in ostrich-like behavior regarding constitutional rights violations. The record contains no proof that Chief Shulhan knew about a "code of silence" and failed to act. While *Marchese v Lucas*, 758 F2d 181 (CA 6, 1985), contains broad language imposing on command level officials almost an omniscient duty to know and act, the standards articulated in *City of Canton v Harris*, 489 US 378; 109 S Ct 1197; 103 L Ed 2d 412 (1989), seem to modify the broad policy language of *Marchese*. Chief Shulhan conceded that the desk sergeant failed in his duty to inquire how Anthony Sudul sustained his injuries. We cannot conclude that these proofs established the city's deliberate indifference that acted as a moving force resulting in the violation of Mr. Sudul's right to be free from the use of excessive force.

The police department also had a policy in place that permitted a citizen to complain about police misconduct to the front desk officer. Chief Shulhan testified that if the desk sergeant could not resolve the citizen's complaint, the officer was to reduce the complaint to writing and transmit it for further investiga-

tion. Mr. Sudul himself never complained of excessive force at the time; indeed, he did not complain until suit was filed. Family members testified that they complained, but were deterred by the obstructive conduct of the front desk sergeant.

The police chief did not delegate complete discretion to the desk sergeant, who is not a final policymaker, to implement departmental policy, where the police chief knew about force resulting in physical injury and decided not to inquire. The police chief may well have been negligent in not identifying the Sudul case as one that warranted investigation. But we do not believe that a reasonable jury could find that Chief Shulhan's conduct was so deliberately indifferent that it was the moving force in the constitutional violation.

### B. THE CHIEF'S POST-LAWSUIT BEHAVIOR

Next, the author of the dissent/concurrence would find deliberately indifferent the police chief's failure to conduct a full-scale, parallel investigation after plaintiffs filed the instant lawsuit. The chief's conduct after the lawsuit was filed *in February 1992* did not cause or act as the moving force in the deprivation of Anthony Sudul's Fourth Amendment rights during and after his arrest *in October 1991*. It is a logical impossibility. The flawed custom or policy (the chief's post-lawsuit behavior) and the constitutional violation are not connected in any logically or legally relevant manner. Proof of causation is utterly absent on this record.

Moreover, the chief's reliance on the advice of the city attorney and the city's retained counsel after litigation ensued cannot fairly be styled as "deliberately

indifferent." Once any lawsuit arises against a municipality, the management responsibility shifts to additional officials. The chief did not offend 42 USC 1983 when he did not conduct a separate but parallel investigation but consulted with defense counsel, who also reported to the city attorney and the city council, regarding the lawsuit. The chief's reasonable actions in consulting with the city's legal counsel rather than mounting an independent investigation do not warrant a finding of deliberate indifference.

Most fundamentally, the proposed use of the chief's post-lawsuit behavior as suggested in the dissent/concurrence would offend procedural due process. The chief's post-lawsuit behavior was never specifically charged or articulated by plaintiffs as a ground for complaint. Even the last amended complaint does not allude to the police chief's failure to investigate after suit was filed. Plaintiffs never advanced this theory of liability in their opening statement or closing argument. The only developed record of the chief's post-lawsuit conduct arose through defense counsel's questions to the chief in rebuttal of a short inquiry on plaintiffs' direct examination.

### C. LIABILITY FOR SINGLE INCIDENT

Finally, although it is not necessary to our decision, we question the continuing validity of the legal conclusion that a single mistake of a municipal policymaker can amount to an unconstitutional municipal custom, policy, or practice. Recently, the United States Supreme Court has indicated an intent to consider whether a single incident of deliberate indifference can justify municipal liability under 42 USC 1983. *Brown v Bryan Co*, 67 F3d 1174 (CA 5, 1995),

cert gtd sub nom *Bryan Co Bd of Co Comm'rs v
Brown*, ____US ____; 116 S Ct 1540; 134 L Ed 2d 645
(1996). See, generally, *Pembaur v Cincinnati*, 475 US
469; 106 S Ct 1292; 89 L Ed 2d 452 (1986); *Monell v
New York City Dep't of Social Services*, 436 US 658;
98 S Ct 2018; 56 L Ed 2d 611 (1978); *Oklahoma City v
Tuttle*, 471 US 808; 105 S Ct 2427; 85 L Ed 2d 791
(1985). Although *Bryan Co* involves deliberately indif-
ferent conduct involved in a background investiga-
tion, the underlying principle applies in this setting.
We would adopt the dissenting opinion of Circuit
Judge Emilio Garza in *Bryan Co, supra* at 1186:

> I do not agree, therefore, with the majority's implicit rea-
> soning that any 'distinction between policies that are them-
> selves unconstitutional and those that cause constitutional
> violations' is 'metaphysical.' *Tuttle*, 471 US at 833 n 8, 105 S
> Ct at 2441 n 8 (Brennan, J., concurring). The majority incor-
> rectly, in my opinion, follows our opinion in *Gonzalez* [*v
> Ysleta Independent School Dist*, 996 F2d 745 (CA 5, 1993)]
> in holding that Sheriff Moore's single decision created
> municipal liability, without reconciling the Supreme Court's
> instruction in Tuttle that a jury must have 'considerably
> more proof than the single incident' before it can find cau-
> sation. There is a constitutional difference between a sheriff
> ordering his deputies to violate citizens' constitutional
> rights, see, *e.g., Pembaur*, 475 US, at 484-485, 106 S Ct at
> 1300-01 (imposing liability for County Prosecutor's direct
> order to police officers to violate Fourth Amendment), and
> one that hires a reserve deputy without conducting an ade-
> quate background investigation. In the latter instance,
> greater proof is required in order to establish the connec-
> tion between the policy and the constitutional violation.

As Judge Garza observed, a policymaker's single
act of deliberate indifference is not the municipal pol-
icy of a governmental entity. The record does not
reflect an inadequacy amounting to deliberate indif-

ference in the department's policy of handling complaints of police misconduct; instead, it depicts the flawed execution of that policy in this case.

The theory articulated in the dissent/concurrence is a veiled method of imposing respondeat superior liability on the city for the wrongful behavior of the desk sergeant in failing to pursue the Sudul family's complaint. Hamtramck did not authorize or ratify this police misconduct through its customs, policies, or practices. No constitutional provision is offended by requiring a civil rights complainant to proceed on the basis of a formal complaint. Police investigation of all crimes, including potential civil rights violations, usually proceeds in such a fashion. In governmental bureaucracies, committing scarce resources to investigations on the basis of written complaints, rather than mere verbal ones, is both sensible and orderly. Indeed, this Court requires more than only oral representations by litigants, no matter how egregious their constitutional claims may be.

Assuming that Chief Shulhan was somehow deliberately indifferent for failing to investigate this case, his single error was not the moving impetus in the two officers' misconduct, where the existing investigative structure, pursuant to demonstrated policy, previously had resulted in internal investigations of police misconduct claims by the final policymaker. Not every act of a municipal policymaker amounts to a municipal custom, policy, or practice. *Bryan Co, supra.* See also *Rushing, supra* at 267 (BOYLE, J., concurring).

As a matter of pure logic, a single incident does not a custom, policy, or practice make. Webster's Third New International Dictionary defines "policy" as a

"definite course or method of action selected . . . from among alternatives and in light of given conditions to guide and determine present and future decisions." A "custom" is defined as "a usage or practice that is common to many or to a particular place or class or is habitual with an individual," a "long-established practice . . . considered as unwritten law," or a "repeated practice." A "practice" is defined as "repeated or customary action."

Where a policymaker's decision does not itself directly order or authorize a constitutional violation, more than a single incident should be necessary to establish causation. 42 USC 1983 imposes liability for violations of constitutional rights, not for violations of duties of care under tort law. The United States Supreme Court may clarify the governing standards in the *Bryan Co* case. If that Court adopts a more stringent standard, defendant would be entitled to a directed verdict on legal grounds.

Because the record does not reflect a custom or policy of deliberately indifferent supervision and discipline that proximately caused the use of excessive force against plaintiff Anthony Sudul, we direct the entry of a verdict for defendant city with respect to plaintiff's 42 USC 1983 claim.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

P. D. Houk, J., concurred.

Murphy, P.J. *(concurring in part and dissenting in part)*. Defendants City of Hamtramck and Hamtramck police officers William Robinson and David Donnell appeal as of right a judgment entered on a

jury verdict in which the jury found that in effecting an arrest of plaintiff Anthony Sudul the police officers used excessive force and assaulted and battered Sudul in the presence of his wife and minor children and that the city, through its police department, failed to investigate and was deliberately indifferent to whether excessive force was used by the officers. The jury awarded plaintiffs a total of $200,000 in damages.

I dissent from the majority's holding that instructional errors regarding assault and battery by gross negligence infected the jury instructions as a whole and tainted the entire verdict, requiring reversal on all claims. I further disagree with the majority's conclusion that the jury could not find the City of Hamtramck liable under 42 USC 1983 for violating Anthony Sudul's constitutional rights. I conclude that on the basis of current sound legal principles and on the evidence presented at trial, a reasonable jury could appropriately find that Hamtramck police officers in this case used excessive force against Anthony Sudul and that Hamtramck Police Chief Alexander Shulhan's conduct was deliberately indifferent to the excessive force used by the police officers such that the municipality would be liable under 42 USC 1983.

Following is a synopsis of the testimony presented at trial and a discussion of the various issues raised by defendants on appeal.

This case arises out of the arrest of plaintiff Anthony Sudul, a Polish immigrant, on October 22, 1991, for driving thirty-nine M.P.H. in a twenty-five M.P.H. zone and for fleeing and eluding a Hamtramck police officer. On that day Sudul drove his children to a soccer game and stopped on the way to pick up a

friend of his son Robert. When he stopped in front of
the friend's house, Anthony Sudul noticed for the first
time a police car behind him. According to plaintiffs,
Sudul and the officer each got out of their cars, the
officer asked Sudul for his license, Sudul realized he
had left his wallet at home, and Sudul asked the
officer whether he could go to his house a few blocks
away to get it. The officer said nothing and returned
to his police car. Sudul apparently construed this as
consent and drove to his home to get his license. In
contrast, the officer testified that he parked his police
car at an angle in front of Sudul's car, Sudul remained
in his car, and, when the officer asked him for his
license, Sudul swore at him. The officer testified that
he believed that he told Sudul to stay in his car and
that, as he walked back to his police car, Sudul put
his car into drive and took off, causing him to have to
leap toward the hood of the police car so he would
not get hit. The officer then proceeded after Sudul
and radioed that he was in pursuit of a traffic violator
that would not pull over.

Anthony Sudul drove home and retrieved his wallet
and his license while his seven-year-old son Bernard
and two-year-old daughter Victoria waited in the car.
As Anthony Sudul walked down the front steps of his
house with his wallet in his hands, the pursuing
police officer and four other Hamtramck police
officers, all of whom were physically much larger
than Sudul, were in front of the Suduls' house. The
pursuing officer yelled, "That's him," grabbed Sudul's
arm, and walked Sudul toward his car for the purpose
of having him put his hands on the trunk of the car.
According to plaintiffs, four or five officers, including
officers Robinson and Donnell, surrounded Sudul and

smashed his head against the trunk of his car at least
three times, pulled his legs out from under him caus-
ing him to fall on the curb and hit his head, dragged
him toward the lawn while kicking, punching and
beating him, and smashed his head against the side-
walk several times. Teresa Sudul, Anthony's wife, who
had come outside the house, screamed at the officers
not to hit Anthony. Bernard came out of the car and
told the officers, "Don't beat my father up," while Vic-
toria remained in the car crying and screaming. Plain-
tiffs testified the police officers handcuffed Anthony
Sudul, picked him up, pushed him into the police car,
causing Sudul to hit his head on the top of the car as
he was pushed in, and then took Sudul to the police
station. According to plaintiffs and a neighbor who
witnessed the event, Sudul offered no resistance to
the arresting officers other than to cover his head
while the officers beat him. Plaintiffs claimed that as
result of the beating Sudul had bruises on his legs
and chest, his right eye was closed, he had marks on
his wrists from being picked up and carried by the
handcuffs behind his back, and he had blood dripping
from his nose and on his mouth and T-shirt. Anthony
Sudul testified that although he was bleeding when he
was brought into the police station, the desk ser-
geant, who had seen him come in, never inquired
about his injuries and offered no medical assistance.
Sudul's wife, sister, and brother-in-law, Leonard Plaza,
subsequently came to the police station to bail Sudul
out of jail. Upon seeing his physical condition, they
attempted to complain to the desk sergeant but,
according to Plaza, the desk sergeant told them "to
get the [profane word] out of here or I'll put you
under arrest" and shut the window at the desk in

their faces. Plaza testified that they felt so threatened and overcome with fear by this that they left. Plaza took photographs of Sudul the next day to show the extent of his injuries; the photographs were admitted into evidence at trial.

In marked contrast, although their testimony varied slightly, the police officers testified that Anthony Sudul would not allow them to place his hands on the trunk of the car, he twisted and struggled to be free of their grasp, and in an effort to subdue him the officers forced him to the ground so they could handcuff him. According to all the officers, no one at the scene in any way used excessive force against Anthony Sudul. The officers testified either that Sudul was uninjured or that his injuries were minor. The desk sergeant at the police station, who was the ranking officer on duty, stated that Anthony Sudul had no visible injuries that he was aware of and that Sudul never voiced a complaint to him about the arrest or asked for medical attention.

The preliminary complaint report (arrest report) filed in the matter stated that Anthony Sudul "started to resist arrest and fight with the officers. He was subdued, handcuffed, and brought to the station and booked." The report did not indicate that Sudul was injured. Chief Shulhan testified that the contents of the preliminary complaint report would have notified him that nonlethal force had been used by the officers to subdue Anthony Sudul, but that it would have been up to the desk sergeant to make the initial determination whether excessive force had been used. Chief Shulhan testified that, although it was the duty of the police chief to make the ultimate determination whether unnecessary force was used, if the

desk sergeant did not make a report that excessive force was used in a case, that would be the end of the matter unless the person who was injured came in and made a formal complaint. Chief Shulhan testified that after the lawsuit was filed he read the arrest report, read a synopsis furnished by an attorney of the defendant officers' depositions, and believed that he spoke with the arresting officer, but he did not talk to Anthony Sudul, his neighbors, witnesses, or the other officers involved because he believed the facts in this case did not warrant an investigation. The police officers involved also testified that there was no investigation into the incident concerning whether excessive force was used by any of the officers.

Following the eleven-day trial, the jury found: (1) that Hamtramck police officers Robinson and Donnell committed assault and battery by gross negligence against Anthony Sudul, and awarded him $20,000 in compensatory damages; (2) that officers Robinson and Donnell inflicted emotional distress on Bernard Sudul by gross negligence, and awarded Bernard $35,000 in compensatory damages; (3) that officers Robinson and Donnell used excessive force against Anthony Sudul and were deliberately indifferent to his federal constitutional rights, and awarded him $25,000 in compensatory damages and $40,000 in punitive damages; (4) that by custom, policy, or practice the city deprived Anthony Sudul of his federal constitutional rights by failing to investigate whether excessive force was used, and awarded him $40,000 in compensatory damages; and (5) that Teresa Sudul suffered a loss of consortium and that she and Bernard Sudul sustained a loss of society or companion-

ship as a result of Anthony's injuries, and awarded them each $20,000 in compensatory damages.

Defendants raise numerous issues on appeal, which I will address separately.

### STATE AND FEDERAL CLAIMS AGAINST INDIVIDUAL POLICE OFFICERS

#### A. ASSAULT AND BATTERY BASED ON GROSS NEGLIGENCE

The jury found defendants Officer Robinson and Officer Donnell liable for assault and battery "by an act of gross negligence," and awarded Anthony Sudul $20,000 in compensatory damages as a result. The first issue is whether plaintiffs substituted gross negligence for the specific intent element of assault and battery, and, therefore, pursued invalid causes of action, or whether plaintiff Anthony Sudul properly pursued the claims of assault and battery by not only establishing the elements of specific intent, but also *in addition*—to get around the governmental immunity statute, MCL 691.1407; MSA 3.996(107)—establishing that the defendant police officers' conduct was grossly negligent. I conclude that the trial court committed legal error warranting reversal of the judgment with respect to Anthony Sudul's claims of assault and battery because it allowed the invalid, hybridized torts of assault by gross negligence and battery by gross negligence, wherein gross negligence was *substituted* for elements of specific intent, to be presented to the jury. The jury's award of $20,000 in compensatory damages to Anthony Sudul for the assault and battery must therefore be vacated.

In their amended complaint, plaintiffs properly pleaded causes of action for assault and battery based on intentional conduct. At trial, the parties

agreed that assault and battery are intentional torts. *Young v Morrall*, 359 Mich 180, 187; 101 NW2d 358 (1960); *Tinkler v Richter*, 295 Mich 396, 401; 295 NW 201 (1940); *Espinoza v Thomas*, 189 Mich App 110, 119; 472 NW2d 16 (1991). "The question of intent and/or willfulness is an element of assault and battery." *Young, supra* at 187. "The intent element for assault is identical with that for battery. There is, properly speaking, no such thing as a negligent assault." Prosser & Keeton, Torts (5th ed), § 10, p 46. Sudul's claims for assault and battery were made against the individual police officer defendants, who have qualified immunity pursuant to MCL 691.1407; MSA 3.996(107), which provides in relevant part:

(1) Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

(2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency shall be immune from tort liability for injuries to persons or damages to property caused by the officer, employee, or member while in the course of employment or service or volunteer while acting on behalf of a governmental agency if all of the following are met:

(a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

(3) Subsection (2) shall not be construed as altering the law of intentional torts as it existed prior to the effective date of subsection (2).

On the basis of the above statute and case law, the parties and the trial court concluded that a government employee is immune from tort liability for negligent conduct within the course and scope of employment and that there is no intentional tort exception to governmental immunity. Plaintiffs conceded that they were proceeding on a basis of gross negligence to get around the governmental immunity statute. The court summed up the understanding of all involved as follows:

[Y]ou have to look at the state of the law. If an officer or any governmental employee is negligent, they're immune. If they commit an intentional tort, they're immune. The only standard by which they can be held is a grossly negligent claim.

\*     \*     \*

Do I think this makes sense? No, I don't think it makes sense at all, but I'm stuck with it just like you're stuck with it . . . .

\*     \*     \*

It makes no sense. So if they're gonna do something, do it real well. I mean, just don't be grossly negligent. Go all the way and be intentional and then you're immune.

In its instructions to the jury, the court appeared to mix together the concepts of gross negligence and assault and battery, instructing the jury that "the officers are not liable to Plaintiffs for assault, battery or excessive force *unless you find that their actions were grossly negligent*," and that plaintiffs could be compensated for damages "which you decide has resulted from the *assault, battery and excessive force by the Defendants' grossly negligent conduct . . . .*" Defendants objected, arguing that conceptually there could be no valid cause of action for grossly negligent assault and battery. The court simply noted the objection on the record. Then, in the verdict form submitted to the jury, the jury was asked whether the officers assaulted Anthony Sudul "by an act of gross negligence" or committed a battery upon Sudul "by an act of gross negligence." The jury found Officers Donnell and Robinson liable for assault and battery by gross negligence.

Giving the benefit of the doubt to plaintiffs, although plaintiffs' counsel may have attempted to establish gross negligence as an *additional* burden to establishing assault and battery, the jury instructions and the corresponding verdict questions did not inform the jury that plaintiffs had to prove assault and battery (based on intentional conduct) *plus* an additional burden of proving gross negligence, in which case the additional burden would have been harmless to defendants. See *Mitchell v Daly*, 133 Mich App 414, 424; 350 NW2d 772 (1984). Rather, the court's instructions and the verdict form seemed to permit the jurors to substitute gross negligence for specific intent in finding assault and battery. The court's instructions constituted legal error and con-

fused the jury regarding the necessary intent for the claims of assault and battery. Where an unlawful, erroneous, contradictory, or conflicting instruction is given to a jury on a material issue, the instruction is inherently defective and constitutes error requiring reversal. *Kirby v Larson*, 400 Mich 585, 606-607; 256 NW2d 400 (1977). See also *Scalabrino v Grand Trunk W R Co*, 135 Mich App 758; 356 NW2d 258 (1984). In this case, it appears that because the parties and the court were under the assumption that neither intentional nor negligence-based torts would survive the effect of the governmental immunity statute, plaintiffs and the trial court attempted to put a square peg into a round hole—that is, allow the intentional torts of assault and battery to be established by the lesser standard of grossly negligent conduct because that is what is specifically excepted in MCL 691.1407(2); MSA 3.996(107)(2). The parties' and the trial court's conclusion that there is no intentional tort exception to governmental immunity for individuals was erroneous.

Subsection 2 of § 7 of the governmental immunity statute, added by 1986 PA 175, effective July 7, 1986, sets forth governmental immunity "*except as otherwise provided in this section* [§ 7]" for individual employees of a governmental agency who are acting within the scope of authority, where the agency is engaged in the exercise or discharge of a governmental function, and the individual's conduct does not amount to gross negligence. Thus, subsection 2 is not controlling in determining whether individuals are entitled to immunity if another subsection of § 7 applies. Subsection 3 of § 7 specifically provides that "*[s]ubsection (2) shall not be construed as altering*

*the law of intentional torts as it existed prior to the effective date of subsection (2)."* Analysis under subsection 2 of § 7 is therefore unnecessary, and one need not go through the "hoops" of that subsection, including establishing gross negligence, to maintain intentional tort claims of assault and battery if before July 7, 1986, the intentional torts of assault and battery by individual governmental employees were not barred by governmental immunity. Governmental immunity simply would not be implicated.

The intentional torts of assault and battery—and excessive force—by individual police officers were recognized exceptions to governmental immunity in Michigan both before the enactment of § 7 of the governmental immunity statute on July 1, 1965, and the effective date of subsection 2 of § 7, being July 7, 1986. See *Lockaby v Wayne Co*, 406 Mich 65; 276 NW2d 1 (1979); *Sherbutte v Marine City*, 374 Mich 48; 130 NW2d 920 (1964); *Blackman v Cooper*, 89 Mich App 639, 643; 280 NW2d 620 (1979) (claim that police officer assaulted, battered, and used excessive force upon plaintiff enjoyed no common-law immunity from tort liability); *Burns v Malak*, 897 F Supp 985 (ED Mich, 1995); *Roxbury v Paul*, 838 F Supp 1204, 1209 (WD Mich, 1992), aff'd 7 F3d 234 (CA 6, 1993) ("[p]olice officers had no common law immunity for assaulting, battering, and using excessive force"); *Smith v Yono*, 613 F Supp 50, 54 (ED Mich, 1985) ("[b]ased upon the guidelines established in *Ross* [*v Consumers Power Co (On Rehearing)*, 420 Mich 567; 363 NW2d 641 (1984)], individual police officers employing excessive force in an arrest are not immune from tort liability"). See also discussions in *Smith v Dep't of Public Health*, 428 Mich 540, 608-

609; 410 NW2d 749 (1987), aff'd sub nom *Will v Michigan Dep't of State Police*, 491 US 58; 109 S Ct 2304; 105 L Ed 2d 45 (1989), and *Ross, supra* at 660. A brief overview of some of these cases would be helpful in understanding the conclusions I have reached and the suggested approach to this area of the law that I offer.

Beginning with *Ross, supra* at 620, our Supreme Court held that governmental agencies are immune from tort liability for injuries arising out of the exercise or discharge of a governmental function, i.e., "an activity which is expressly or impliedly mandated or authorized by constitution, statute, or other law." The Court determined that governmental *agencies* had a broad grant of immunity while, in contrast, the immunity extended to *individuals* is far less. *Id.* at 635. The Court noted that to determine the existence of an *individual's* immunity from tort liability, the specific acts complained of are examined, rather than the general nature of the activity as for governmental agencies. *Id.* at 625, 635. Under *Ross*, governmental immunity would not bar an individual's liability for ultra vires activities or for the tortious execution of duties. *Id.* at 634-635. The Court specifically noted that the determination to make an arrest should be afforded a wide degree of discretion, but "[o]nce that decision has been made, however, the execution thereof must be performed in a proper manner, *e.g., the arrest must be made without excessive force.*" *Id.* at 660 (emphasis added). The Court reaffirmed its decision in *Sherbutte, supra,* that whereas a "city cannot be held vicariously liable for torts of its police officers committed during the course of an arrest because the officers were engaged in police activity, which is a

governmental function entitled to immunity," *Ross*, *supra* at 625, there is no individual immunity for the police officers from tort liability for tortious performance of a duty—specifically excessive force in effecting an arrest, *id.* at 660, n 51.

In the subsequent case of *Smith v Dep't of Public Health*, *supra*, the plaintiff filed suit for false imprisonment, inter alia, against *state agency* defendants. The Court in *Smith* held in part that "[t]here is no 'intentional tort' exception to governmental immunity." 428 Mich 544. I believe it is this bare holding that created the confusion in the instant case. Justice BRICKLEY, who wrote the lead opinion in *Smith*, reaffirmed the determination in *Ross* that an analysis of immunity for individuals differs from that of governmental agencies; for governmental agencies the focus is on the general activity involved at the time an alleged tort occurs, whereas for individuals the focus is on the specific conduct involved at the time. *Id.* at 607-608. As an example of how this was applied, Justice Brickley discussed the opinion of the federal district court in *Smith v Yono*, *supra*. 428 Mich 608-609. The court in *Yono* relied on *Ross* in determining whether municipal defendants and individual police officers were protected by governmental immunity against allegations that the officers used excessive force and committed assault and battery in effectuating an arrest. In focusing on the liability of the municipality, the court in *Yono* determined that the *general nature* of the activity being engaged in by the officers at the time the alleged torts were committed was the *arrest* of the plaintiff and, being a police activity that was expressly or impliedly mandated or authorized by law, the municipalities were protected by governmen-

tal immunity. *Yono, supra* at 53-54. However, the *specific conduct* of the individual police officers in *using excessive force* in the arrest was not entitled to immunity. *Yono, supra* at 54. Justice BRICKLEY concluded his analysis on this subject by finding that "the intentional use or misuse of a badge of governmental authority for a purpose unauthorized by law is not the exercise of a governmental function." 428 Mich 611. Thus, an analysis of *Smith* beyond its bare holding reveals that claims against individual police officers for assault, battery, and excessive force survive governmental immunity, while claims against the governmental agencies for these torts would not survive governmental immunity.

Following *Smith v Dep't of Public Health,* our Supreme Court issued an opinion in *Hadfield v Oakland Co Drain Comm'r,* 430 Mich 139; 422 NW2d 205 (1988), which I believe is instructive and suggests the analysis to be employed in this case. In *Hadfield,* the threshold question presented was "whether, in light of the governmental tort liability act and *Ross, any* common-law tort-based exception to governmental immunity may be recognized." *Id.* at 145 (emphasis in original). The Court answered in the affirmative, concluding that with respect to the actions before it for consideration, trespass-nuisance, an intentional tort, survived the governmental immunity act. The Court noted that the defendants, who were governmental agencies, argued against any judicially created exceptions and asserted that liability should be confined to the specifically enumerated statutory exceptions. The Court disagreed, stating that defendants failed to recognize the second sentence of MCL 691.1407; MSA 3.996(107), now codified in subsection 1 of the stat-

ute. *Hadfield, supra* at 146-147. The Court determined that this sentence in the statute retains preexisting governmental immunity law except where provided otherwise in the act and concluded that actions for trespass-nuisance were recognized exceptions to governmental immunity in Michigan case law at the time the statute was enacted and therefore survived it. *Id.* at 147, 169, 205.

Most recently, the federal district court in *Burns v Malak, supra,* considered a plaintiff's claim of excessive force and state claims of assault and battery brought against individual police officers. The court determined that the holding of *Smith v Dep't of Public Health* did not apply to the "intentional" actions attributed to the defendants in *Burns* because "*Smith* was not focusing on immunity for the intentional acts of individuals; rather, it was dealing with the issue of immunity for governmental agencies." *Burns, supra* at 987. The court noted that it is expected that police officers may perform intentional acts that are intended to cause harm and for which there is no liability; for example, a police officer may use substantial but necessary force to subdue a suspect, resulting in injury to the suspect. *Id.* at 988. The court determined that in such situations there would be no liability on the part of the police officer, not because of the defense of immunity, but because there was no wrongful conduct, i.e., no "tort." The court further noted that, conversely, if a governmental employee acting in the course of employment negligently injured another, there would be liability but for the immunity provided by MCL 691.1407; MSA 3.996(107). The court concluded that

it would be an absurd result to hold that a governmental employee, *e.g.* a police officer, who causes injury to another as a result of his or her "grossly negligent" conduct shall be deprived of the defense of governmental immunity and held liable, while a fellow officer who deliberately and intentionally causes injury during the same arrest would be "immune" from liability, because § 691.1407(2) does not expressly refer to "intentional" conduct in its immunity provisions. [*Burns, supra* at 988.]

I agree with the court's sentiments in *Burns*. I further agree with the court's conclusion that because police officers had no common-law immunity for assault and battery, subsection 3 of § 7 of the governmental liability statute provided that they were not immune from liability for such conduct. *Id.* at 988-989.

Governmental immunity has been, at best, a confusing area of the law for the bench and bar of our state for many years and, unfortunately, attempts to explain it have often resulted in increasing the quagmire in which we collectively have found ourselves on this subject. My review of the above cases leads me to suggest the following, fairly straightforward approach that I hope will provide some clarification on this subject, noting, however, that this analysis does not include an analysis of sections of the governmental immunity statute other than § 7 and does not include actions against hospitals, county medical care facilities or their agents or employees as provided in subsection 4 of § 7 or actions against judges, legislators, and elective or highest appointive executive officials as provided in subsection 5 of § 7.

First, a plaintiff who sues a governmental defendant must determine the *type of governmental entity* involved as a defendant in the case, i.e., whether the defendant is a governmental agency or an *individual*.

Governmental immunity for governmental agencies is set forth in subsection 1 of § 7 of the governmental immunity act. Governmental immunity for individuals is set forth in subsections 2 and 3 of § 7 of the act. As is apparent from the discussion of case law presented above, the scope of governmental immunity is much narrower for individuals than it is for governmental agencies, and a holding that is applicable to governmental agencies is not necessarily applicable to individuals employed by an agency. Therefore, when reviewing case law, it is important to identify the type of governmental entity involved in the case being reviewed.

Next, the *type of action* that the plaintiff is pursuing must be determined. *If the action is against a governmental agency,* the plaintiff should refer to the second sentence of subsection 1 of § 7 and determine if the action is the type that would have survived governmental immunity had it been brought before July 1, 1965, the date the statute was first enacted. Otherwise, pursuant to subsection 1 of § 7, the agency is immune from tort liability if the tort was committed while the agency was engaged in the exercise or discharge of a governmental function. *If the action is against an individual* and involves an intentional tort, the plaintiff would proceed under subsection 3 of § 7 and determine if an action for the intentional tort was barred by governmental immunity before July 7, 1986, the date that subsection 2 was added to the statute. If an action for the intentional tort was not barred by governmental immunity before that date, the plaintiff would proceed against the individual in the action without further application of governmental immunity to that defendant. If the action

against an individual is not for an intentional tort that would have survived governmental immunity as it existed on July 7, 1986, the plaintiff would proceed against the individuals under subsection 2 of § 7 of the statute. Thus, for actions that are based in negligence or gross negligence, the plaintiff would proceed against individuals under MCL 691.1407(2); MSA 3.996(107)(2), although admittedly that section bars actions based on ordinary negligence.

Regarding the claims presented in the instant case, a plaintiff would proceed directly under subsection 3 of § 7 in an action against police officers who were *direct* perpetrators of assault and battery or who engaged in acts of excessive force under state law; governmental immunity would not otherwise be implicated. It would be up to the plaintiff to establish the elements of assault, battery, and excessive force, and it would be up to the defendant officers to establish any cognizable defense, e.g., justification or reasonable force, in which case there would be no "tort." Thus, on retrial, plaintiff Anthony Sudul would proceed under subsection 3 of § 7 on his claims of assault and battery against the individual officers who directly inflicted injuries on him, e.g., kicking, smashing his face, and punching him.

However, other police officers, who were on the scene and who had a special duty to protect the person being injured but failed to do so, may also be found liable for the victim's injuries. Recklessness that creates a risk that a battery may result may afford a distinct cause of action, and where there is a duty of protection there may be liability. Prosser & Keeton, Torts (5th ed), §§ 9, 132, pp 41, 1063; 6 Am Jur 2d, Assault and Battery, § 128, p 108. The federal

court in *Roxbury v Paul, supra,* 838 F Supp 1208-
1209 recognized a claim for "gross negligence" under
MCL 691.1407(2)(c); MSA 3.996(107)(2)(c) separate
from claims of assault and battery. The plaintiff
would first have to establish that the "bystander"
officers owed him a special duty of protection, apart
from the duty owed to the public in general. *Ross,
supra* at 658; *Harrison v Director of Dep't of Correc-
tions,* 194 Mich App 446, 456-460; 487 NW2d 799
(1992). The plaintiff would also have to establish that
the conduct of the bystander officers was "a" proxi-
mate cause of the plaintiff's injuries. *Dedes v Asch,*
446 Mich 99; 521 NW2d 488 (1994). Analysis of
"bystander" officers' liability would be done under
subsection 2 of § 7 because these officers would not
have engaged in the actual assault and battery and
therefore did not engage in the intentional tort, but
the officers may have been grossly negligent in failing
to stop it. Thus, on retrial, Anthony Sudul could pro-
ceed under subsection 2 of § 7 against the
"bystander" officers if he could establish that the
officers at the scene who did not directly punch, hit,
and kick him had a special duty to protect him from
that harm but failed to do so and could further estab-
lish (1) that the officers were acting or reasonably
believed they were acting within the scope of their
authority, (2) that the police department was engaged
in the exercise or discharge of a governmental func-
tion (concededly this is the case here, see *Smith v
Yono, supra*), and (3) that the bystander officers' con-
duct was grossly negligent, i.e., conduct so reckless
as to demonstrate a substantial lack of concern for
whether an injury resulted to plaintiff, MCL
691.1407(2); MSA 3.996(107)(2).

B. INFLICTION OF EMOTIONAL DISTRESS BY GROSS NEGLIGENCE

Defendants next claim it was manifest error for the trial court to allow plaintiff Bernard Sudul, Anthony's seven-year-old son who witnessed the incident, to proceed on a claim for infliction of emotional distress by an act of gross negligence, a cause of action that is not recognized in this state. I disagree.

I agree with the majority that our Supreme Court has yet to formally recognize the tort of intentional infliction of emotional distress; however, that point is irrelevant because plaintiffs did not proceed on such a claim at trial. The trial court struck plaintiffs' claims for intentional infliction of emotional distress, but allowed plaintiff Bernard Sudul, to proceed on a claim of infliction of emotional distress by gross negligence. It is well recognized in this state that a person may recover on a theory of bystander recovery for the infliction of emotional distress caused by observing the negligently inflicted injury of a third person if the plaintiff is an immediate member of the victim's family. *Nugent v Bauermeister*, 195 Mich App 158; 489 NW2d 148 (1992); *Wargelin v Sisters of Mercy Health Corp*, 149 Mich App 75; 385 NW2d 732 (1986); *Gustafson v Faris*, 67 Mich App 363; 241 NW2d 208 (1976). Bernard Sudul pursued his infliction of emotional distress claim based on bystander recovery—a negligence-based claim—but substituted the higher standard of gross negligence for mere negligence to get around MCL 691.1407(2)(c); MSA 3.996(107)(2)(c), which requires that an individual's conduct amount to gross negligence to survive a defense of governmental immunity under that subsection, and the court instructed the jury accordingly. If plaintiffs would have proceeded on a claim of

bystander recovery based on mere negligence, Bernard's claim would have been barred by MCL 691.1407(2); MSA 3.996(107)(2).

I find no error in allowing recovery for infliction of emotional distress based on bystander recovery but wherein gross negligence is proved. Contrary to the assertion made by the majority, I am not recognizing the novel tort of grossly negligent infliction of emotional distress, although Bernard Sudul's cause of action was, unfortunately, referred to as such below. I am merely recognizing the continued viability of a claim for bystander recovery for emotional distress, see *Nugent, supra* at 159-161, and recognizing that a plaintiff may prove a higher degree of fault than that required to sustain the cause of action. Because plaintiffs proved more than they needed to prove to prevail on the claim for bystander recovery and because they established gross negligence, a requirement under the governmental immunity statute, defendants were not prejudiced thereby. See *Mitchell v Daly, supra*, 133 Mich App 424. This was *not* a situation where plaintiffs' burden was decreased, as in the claims for assault and battery. I would affirm the jury's finding of infliction of emotional distress with regard to Bernard Sudul.

The majority concludes that the event witnessed by seven-year-old Bernard Sudul could not have been shocking or outrageous because it "may well have been nothing more than a lawful arrest involving the use of reasonable force." I believe the determination concerning whether the force used by the police officers against Anthony Sudul was reasonable or excessive—and therefore shocking for Bernard Sudul to witness—was appropriately a determination to be

made by the jury and was *the* central issue in the
case. The record, in my opinion, would support the
jury's finding.

### C. COTERMINOUS STATE AND FEDERAL CLAIMS

The jury found defendants Robinson and Donnell
liable for state claims of assault and battery by gross
negligence and awarded Anthony Sudul compensatory damages for these claims and, in addition, found
these defendants liable under 42 USC 1983 with
regard to a federal claim of excessive force and
awarded Sudul damages for this as well. Defendants'
claim that the state claims for assault and battery are
coterminous with and duplicative of the federal claim
for excessive force is without merit.

The state claims of assault and battery allege *physical* harm as a result of the police conduct. See Prosser & Keeton, Torts (5th ed), §§ 9, 10, pp 39, 43. The
federal claim under § 1983 of excessive force alleges
deprivation of a *constitutional right* guaranteed by
the Fourth Amendment, which guarantees citizens the
right to be secure against unreasonable seizures. *Graham v Connor*, 490 US 386, 395; 109 S Ct 1865; 104 L
Ed 2d 443 (1989). See also *York v Detroit (After
Remand)*, 438 Mich 744, 757-758; 475 NW2d 346
(1991), for discussion of other federal constitutional
rights, the violation of which may be remedied by an
action under 42 USC 1983. Thus, even though the
assault and battery and excessive force claims may
have arisen out of the same circumstances, the damages awarded by the jury compensate for different
harms. A deprivation of a constitutional right has
been held to be a distinct harm. See *Garner v Michi-*

*gan State Univ*, 185 Mich App 750, 764; 462 NW2d 832 (1990).

### D. EXCESSIVE FORCE CLAIMS UNDER 42 USC 1983

Defendants next argue that the trial court used an incorrect, obsolete subjective standard of malice, wantonness, and reckless disregard in instructing the jury concerning plaintiff Anthony Sudul's claims under § 1983 for excessive force. Defendants are incorrect.

I first note that defendants have not preserved this issue by objecting below to the complained-of jury instructions concerning excessive force; therefore, this Court's review is precluded absent manifest injustice. MCR 2.516(C); *Phillips v Deihm*, 213 Mich App 389, 403; 541 NW2d 566 (1995). During jury deliberations, defendants objected to the *extent* of reinstruction of the jury regarding excessive force and reasonable force, but did not object to the substance of those instructions. Moreover, defendants' argument on appeal is disingenuous because in their motion for a new trial they belatedly claimed error in the trial court's instruction regarding excessive force, arguing that the court erred because it did *not* instruct the jury that excessive force had to be applied maliciously or sadistically. In any event, contrary to defendants' assertion on appeal, the trial court's instructions to the jury concerning excessive force comported with the "objective reasonableness" standard enunciated in *Graham*, *supra* at 395, which held that in § 1983 actions "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed

under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach" (emphasis in original). The trial court in this case correctly instructed the jury that whether the force used by the officers was unnecessary was to be determined in light of all the surrounding circumstances as judged from the perspective of a reasonable, prudent police officer on the scene, rather than with 20/20 vision of hindsight. See *Graham, supra* at 396-397. The trial court also correctly instructed the jury that "an officer who used more force than is reasonably necessary to effect a lawful arrest commits a battery upon the person arrested to the extent that the force used was excessive." The instruction is taken directly from SJI2d 115.09. The essence of this instruction was repeated to the jury upon the jurors' request and upon the specific agreement of all counsel.

Defendants further claim error because the trial court did not instruct the jury and the corresponding special verdict question did not inform the jury that it first must find that the officers used excessive force before it could consider whether the officers were entitled to a good-faith defense against the claim. Again, I note that defendants did not preserve this claim because the relevant jury instructions were not challenged below, MCR 2.516(C), and defense counsel placed no objections on the record regarding the jury verdict form before its submission to the jury, MCR 2.514; *Hammack v Lutheran Social Services of Michigan*, 211 Mich App 1, 10; 535 NW2d 215 (1995). However, I will briefly discuss this issue for the benefit of the parties.

State law immunities and defenses do not apply to a claim of excessive force brought under 42 USC 1983. *Howlett v Rose*, 496 US 356; 110 S Ct 2430; 110 L Ed 2d 332 (1990); *Martinez v California*, 444 US 277, 284, n 8; 100 S Ct 553; 62 L Ed 2d 481 (1980); *Rushing v Wayne Co*, 436 Mich 247, 259; 462 NW2d 23 (1990). In *Graham, supra* at 399, n 12; the United States Supreme Court stated that a police officer's *objective* "good faith', i.e., whether he reasonably could have believed that force used did not violate the Fourth Amendment, may be relevant to the availability of the qualified immunity defense to monetary liability under § 1983, but the Court expressed no view concerning its proper application in excessive force cases that arise under the Fourth Amendment. The federal circuit courts disagree whether qualified immunity is available as a matter of law as a defense against a claim of excessive force. See *Alexander v Riccinto*, 192 Mich App 65, 72; 481 NW2d 6 (1991), and 61 ALR Fed 7, § 8, pp 43-47. In the instant case, where the trial court did instruct the jury that plaintiff had the burden of proving excessive force and defendants had the burden of proving a defense of necessary force or good faith, there was no error where factual determinations of whether excessive force was used and the defenses against it were not removed from the jury's consideration. Cf. *Riccinto, supra* at 72-73. See also 5 Am Jur 2d Arrest, §§ 146, 147, p 770; 82 ALR4th 598, §§ 2, 3, pp 601-608, regarding burdens of proof.

I disagree with the majority's determination that the trial court's instructions regarding assault, battery, and gross negligence rendered the jury's verdict regarding excessive force unsound. To establish

excessive force, which is a constitutional tort, only the "objective reasonableness" test set forth in *Graham* needs to be met, *on which this jury was properly instructed*, without regard to the officers' "requisite fault" or their intent. *Graham, supra* at 395-397; 5 Am Jur 2d Arrest, §§ 106, 145, pp 744, 769; 82 ALR4th 598, §§ 2, 3, pp 601-608. The unlawfulness of the contact, by virtue of its "unreasonableness," seems to satisfy any requirement of fault and the intent with which the injury was done is immaterial. 60 ALR2d 873, § 3, p 878. It was unnecessary for plaintiff to establish "gross negligence" in relation to his excessive force claim because state law immunities, which would include Michigan's governmental immunity statute, do not apply to claims brought under 42 USC 1983, *Howlett, supra; Martinez, supra; Rushing, supra.* However, the court instructed the jury concerning excessive force by grossly negligent conduct in its instructions to the jury explaining gross negligence and in its instructions regarding damages. To the extent that the trial court erroneously instructed the jury regarding gross negligence in relation to excessive force, the instructions imposed an additional burden on plaintiff not required under *Graham, supra* at 395-397. The error is harmless, however, because it prejudiced plaintiff—not defendants—and plaintiff prevailed on his claim, sustaining a burden in addition to that which was required of him to meet. See *Mitchell v Daly, supra*, 133 Mich App 424. I specifically do not agree with the majority's conclusion that the court in its supplemental instructions to the jury merged an erroneous definition of assault and battery with the definition of excessive force. All counsel agreed with the substance of the instructions,

and the definitional instructions were correct statements of the law.

In my opinion, defendants should not be heard now to complain regarding the court's instructions concerning excessive force by gross negligence where they proposed below that there should have been an excessive force claim based on gross negligence, they did not challenge the court's instructions regarding excessive force, they specifically agreed with the substance—although not the extent—of the supplemental instructions given to the jury regarding assault, battery, and excessive force, and they agreed to the form of the special verdicts to be decided by the jury. Manifest injustice simply does not result to defendants in this instance. I would affirm plaintiff Anthony Sudul's successful claim against officers Robinson and Donnell for use of excessive force.

### MUNICIPAL LIABILITY UNDER 42 USC 1983

Plaintiffs brought a claim against the City of Hamtramck, through its police department, under 42 USC 1983 for its failure to investigate whether its police officers had used excessive force against Anthony Sudul. 42 USC 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Any cause of action brought in a state court under § 1983 requires this Court to review federal law inter-

preting that section. *Payton v Detroit*, 211 Mich App 375, 397; 536 NW2d 233 (1995). In order to establish a claim under 42 USC 1983 against a municipality, a plaintiff is required to show a municipal policy or custom that caused a violation of the person's constitutional rights. *Monell v New York City Dep't of Social Services*, 436 US 658, 690-691; 98 S Ct 2018; 56 L Ed 2d 611 (1978); *York, supra*, 438 Mich 754-755. It is not necessary that the policy or custom itself be unconstitutional. *City of Canton v Harris*, 489 US 378; 109 S Ct 1197; 103 L Ed 2d 412 (1989); *York, supra* at 755. Liability under this section must be premised upon more than the fact that the municipal employee is a tortfeasor. *Monell, supra* at 691. A municipality cannot be found liable under § 1983 on a respondeat superior theory. *Id.; Jackson v Detroit*, 449 Mich 420, 433; 537 NW2d 151 (1995). The policy or custom must originate with the decisionmaker possessing final policymaking authority with respect to the omission or commission at issue. *Pembaur v Cincinnati*, 475 US 469, 482; 106 S Ct 1292; 89 L Ed 2d 452 (1986) (plurality opinion); *Jackson, supra* at 434. To hold a supervisory official liable under § 1983, it must be shown that he " 'at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.' " *Payton, supra* at 402-403, quoting *Bellamy v Bradley*, 729 F2d 416, 421 (CA 6, 1984). Decisions made by officials with final policymaking authority, e.g., the police chief, are attributable to the governmental entity. *Pembaur, supra* at 480-481, 483; *Kentucky v Graham*, 473 US 159, 166; 105 S Ct 3099; 87 L Ed 2d 114 (1985); *Rushing, supra* at 260; *Zumbroegel v Dearborn Heights*, 705 F Supp 358 (ED Mich, 1989).

Acts of omission, as well as commission, may support a finding of § 1983 liability. *Canton, supra* at 390; *Jackson, supra* at 433. Municipal liability need not be premised on acts that the municipality has "ordered." *Pembauer, supra,* at 480. The "act" of the municipality may be one of sanctioning the offensive conduct. *Pembauer, supra* at 480. The policy of inaction at issue must reflect some degree of fault before it may be considered a policy upon which § 1983 liability may be based. *Canton, supra* at 388; *Jackson, supra* at 433. The culpability requirement is necessary to establish the causal link between the municipal policy and a constitutional violation. *Canton, supra* at 388-389; *York, supra* at 755. The alleged policy or custom must be the "moving force" of the constitutional violation in order to establish liability against the governmental entity. *Monell, supra* at 694; *Jackson, supra* at 433. A city's inaction constitutes a policy or custom sufficient to support a § 1983 claim only if it evinces "deliberate indifference" to a person's rights. *Canton, supra* at 388-392; *York, supra* at 756. Mere negligence does not amount to deliberate indifference. *Estelle v Gamble,* 429 US 97, 104; 97 S Ct 285; 50 L Ed 2d 251 (1976); *Jackson, supra* at 430. Justice O'Connor explained in her opinion concurring in part and dissenting in part in *Canton:*

> Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens the dictates of *Monell* are satisfied. Only then can it be said that the municipality has made "a deliberate choice to follow a course of action . . . from among various alternatives." [*Canton, supra* at 396, quoting *Pembaur, supra* at 483-484.]

Accord, *Jackson, supra* at 433-434; *York, supra* at 756.

Generally, "where the [municipal] policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Oklahoma City v Tuttle,* 471 US 808, 824; 105 S Ct 2427; 85 L Ed 2d 791 (1985). The rule was subsequently narrowed in *Pembaur, supra* at 480, wherein the Supreme Court explained that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. The Supreme Court reversed the decision of the Court of Appeals for the Sixth Circuit, which had held that a single decision cannot establish the kind of "official policy" required by *Monell* as a predicate to municipal liability under § 1983. *Pembaur, supra* at 480.

Following the presentation of plaintiffs' proofs in the instant case, defendants moved for a directed verdict with regard to plaintiffs' § 1983 claim against the city, arguing, as they do on appeal, that plaintiffs had not presented sufficient evidence that a custom or policy of deliberate indifference existed, that the city had notice of potentially unconstitutional conduct, or that the city policies were in any way the moving force behind the officers' conduct. The trial court denied defendants' motion, determining that there were material issues of fact regarding whether a custom or policy of deliberate indifference had been satisfied.

The majority concludes that, in their view, the evidence at trial does not show deliberate indifference

by Chief Shulhan, and hence the city, to Anthony Sudul's Fourth Amendment rights. Our Supreme Court has specifically stated that in reviewing a trial court's disposition of a motion for a directed verdict with regard to this issue, this Court is not to undertake an independent review of the record to determine whether plaintiffs' proofs demonstrated a deliberate indifference on the part of the policymakers. *Rushing*, *supra* at 268. Rather, our Supreme Court has determined that "[t]he proper inquiry would have been whether a reasonable jury could have concluded that the deliberate indifference standard had been satisfied." *Id.* I believe that on the basis of the evidence presented in this case a reasonable jury could have concluded that a showing of deliberate indifference had been satisfied in this case.

I first note that contrary to defendants' assertions on appeal, the instant jury found that two police officers were deliberately indifferent to Anthony Sudul's constitutional rights. Thus, this case is unlike *Los Angeles v Heller*, 475 US 796; 106 S Ct 1571; 89 L Ed 2d 806 (1986), in which the Supreme Court held that no municipal liability could attach where a jury concludes that no police officer inflicted constitutional harm (i.e., a police officer is exonerated of an excessive force claim).

I also note at the outset that in establishing the city's liability under 42 USC 1983 for violation of Anthony Sudul's Fourth Amendment rights, plaintiffs did not rely on the "single incident rule," although case law suggests that may have been appropriate in this case, nor did they argue that Chief Shulhan's failure to investigate solely *this* case was a proximate cause of the excessive force in this case. Rather,

plaintiffs argued that the chief's failure to investigate in this case was a piece of evidence that, when linked with evidence of other, prior instances in which the chief failed to investigate claims of excessive force, established a pattern or practice of turning a blind eye, i.e., deliberate indifference, to claims of excessive force used by its officers. Plaintiffs argued that the practice created an atmosphere wherein Hamtramck police officers knew they could engage in similar instances of excessive force without necessarily being called to task or disciplined for their conduct and that the continued practice established the "moving force" or "causal link" for the excessive force used by the police officers in this case.

I hold that liability attaches in this instance not as the result of a veiled method of imposing respondeat superior liability on the city for the wrongful behavior of the desk sergeant, as is suggested by the majority. Rather, I conclude that a reasonable jury could find the city liable under 42 USC 1983 because the police chief, as the municipal policymaker: (1) failed to enforce departmental policies regarding the reporting of incidents of possible excessive force and thus failed to supervise or discipline against the use of such force, and (2) acquiesced in or ratified unconstitutional conduct (excessive force) by police officers by failing to investigate whether the officers used excessive force after being put on notice of facts in support of a claim that the unconstitutional conduct occurred. My conclusions in this regard are discussed below.

In her concurring opinion in *Rushing, supra* at 278-279, Justice BOYLE concludes, in analogizing to *Canton, supra* at 388, that the failure of a policymaker to

enforce proper procedures may evince deliberate indifference to a person's constitutional rights. See also *Marchese v Lucas*, 758 F2d 181, 188 (CA 6, 1985), cert den sub nom *Wayne Co v Marchese*, 480 US 916 (1987). I am persuaded that the failure by the police chief to enforce policies in the instant case evinces such a deliberate indifference. The chief of police testified that when a prisoner is brought into the station with obvious signs of injury, policy mandates that the desk supervisor inquire into the nature of the injuries, initiate an informal investigation regarding how the injuries occurred, make an initial determination whether excessive force was used, and report his findings to the chief. Although the desk sergeant testified that he saw no injuries on Anthony Sudul, plaintiffs presented evidence that Anthony Sudul was bleeding and injured when he was brought into the police station and that the desk sergeant would have observed him; if the jury believed plaintiffs' witnesses, the injuries may have been serious. It is uncontested that the desk sergeant neither inquired into nor reported Sudul's injuries. On the basis of the photographs of Anthony Sudul admitted at trial, the chief testified that the desk sergeant should have inquired regarding how the injuries were sustained and should have indicated on his report that Mr. Sudul was injured. The chief testified that if the desk sergeant did not make a report the matter would be ended unless the person arrested came in and made a formal citizen's complaint. The chief further testified that a citizen's complaint constitutes the enforcement mechanism to ensure that the written reporting policies are followed. However, there was evidence that the desk sergeant refused to take a citizen's com-

plaint from Leonard Plaza and Theresa Sudul regarding the police officers' treatment of Anthony Sudul. The police chief testified that the police department had no duty to take their complaint to investigate the potential use of excessive force by the officers because Anthony Sudul could have made the complaint himself. Under the police department policy, if there was no citizen's complaint—written and preferably notarized—there would be no investigation.

I believe a complainant's right to seek redress within a police department against excessive force necessarily becomes "chilled" where the efforts are met with concealment and intimidation. While I agree with the majority that it is generally prudent to require a victim to file a complaint personally, I believe that a person victimized by police brutality would be reluctant to file a complaint with an officer who he believed participated in concealing such behavior. On the basis of the evidence, the jury could have inferred that the actions of the desk sergeant were an attempt to conceal police brutality in this instance by failing to inquire into or report Sudul's injuries as required by departmental policy and by obstructing and threatening plaintiffs from making a complaint, knowing that the matter would then remain closed. The fact that the department has a citizen complaint procedure in place, which the police chief deemed to be "the enforcement" mechanism, becomes meaningless where the person responsible for processing the complaints to the chief obstructs the process. Notably, the desk sergeant was, of course, the same person responsible for processing the citizen's complaint and for making the initial inquiry and reporting to the chief whether excessive

force was used in this case. Although the chief testi-
fied that he was informed by the preliminary com-
plaint report that nonlethal force was used against
Anthony Sudul, the chief testified that *none* of the
departmental reporting mechanisms informed him
that Sudul was injured, contrary to the understanding
of the majority, or that excessive force was possibly
used. The chief has a duty to ensure that reporting
policies are enforced so that he can be provided with
a sound basis of information to supervise his staff
appropriately regarding use of excessive force. *Rush-
ing, supra; Marchese, supra.* Although investigations
should be conducted on a sound basis and proceed in
an orderly fashion, a policy of requiring a written,
notarized citizen's complaint to spur an investigative
effort could be viewed in some instances as callous
disregard for the very rights the city is responsible for
safeguarding where adequate, alternative notice is
given. See *Fiacco v City of Rensselaer,* 783 F2d 319,
327 (CA 2, 1986), cert den 480 US 922 (1987). Such
adequate, alternative notice was given in this case by
virtue of (1) Anthony Sudul's injuries, into which the
desk sergeant had a duty to inquire and informally
investigate, and (2) plaintiffs' lawsuit, whereby formal
notification to the city was made of Anthony Sudul's
injuries and his claim of excessive force.

In addition to a failure to enforce policy, liability
attaches to the city because of the police chief's fail-
ure to investigate claims of police brutality after hav-
ing received notification of the claims. In the instant
case, the chief was notified of the facts underlying
the incident arguably by the preliminary complaint
report filed following the incident and most certainly
by the lawsuit filed in the case. Chief Shulhan testi-

fied that he conducted no investigation because "the facts didn't warrant it in the case." Plaintiffs presented evidence of two other instances that occurred between 1989 and 1991 where allegations of excessive force had been made but where no investigations took place and no officers were disciplined. The chief testified that, apart from those two instances, six investigations had been conducted during the previous five years as a result of citizen complaints. Out of the six investigations, the chief testified that at least one was referred to the county prosecutor for evaluation and the possible issuance of a warrant involving claims of excessive force. No further evidence was presented regarding the disposition of these investigations. However, the chief testified that the investigation in which the determination was made of possible misconduct was referred to the prosecutor a year to a year and a half before the instant trial. The instant trial was held in August 1993. A year and a half before trial would be approximately February 1992. The incident involving Anthony Sudul occurred in October 1991. Therefore, the relevance of investigations that occurred *after* the arrest that resulted in the instant case is questionable in my view and would not necessarily be indicative of the city's pattern or practice regarding investigations of similar complaints *before* or at the time of Sudul's arrest. However, the very assertion of a number of claims regarding excessive force in the time preceding the Sudul incident put the city on notice of the potential that its police officers used excessive force. *Fiacco, supra* at 328. That there existed a pattern or practice of noninvestigation by the city into similar allegations was a determination that the jury could reasonably

and appropriately make on the basis of the evidence presented by plaintiffs.

In her concurring opinion in *Rushing*, Justice BOYLE cited *Fiacco, supra* at 326, with approval for its proposition that "the city's failure to use reasonable care in investigating claims of police brutality demonstrated a policy of deliberate indifference to the constitutional rights of persons within the city's domain." *Rushing, supra* at 275. Several federal cases have determined that where a person is the victim of police brutality, a failure by the official with final policymaking authority over the officers, e.g., the sheriff or chief of police, to initiate and conduct a serious investigation into the matter after being put on notice of its facts and to discipline the offending parties, constitutes *ratification* of the illegal acts of excessive force, resulting in a custom or policy of deliberate indifference to a violation of the constitutional rights of the person assaulted. See, e.g., *Leach v Shelby Co Sheriff*, 891 F2d 1241 (CA 6, 1989), cert den 495 US 932 (1990); *Marchese, supra*. As in *Leach* and *Marchese*, there was no claim in this case that the chief directly participated in or encouraged the acts of excessive force used by officers against the plaintiff. However, the Sixth Circuit Court of Appeals in *Leach* determined that where the evidence of failure to investigate and to punish the responsible individuals was not confined to the plaintiff's claim, it inferred that the sheriff, or in this case the chief of police, "implicitly authorized, approved or knowingly acquiesced" in the action of the responsible officers. *Leach, supra* at 1246. The culpability requirement of *Canton, supra* at 388-389, is met by the apparent *sanctioning* by the policymaker of the offensive con-

duct, *Pembaur, supra* at 480, and the apparent *ratification* by the policymaker of the illegal acts of excessive force, *Leach, supra* at 1248, *Marchese, supra* at 188. The courts in *Leach* and *Marchese* specifically found that ratification by failure to investigate is sufficient to attach liability to the final policymaker. *Leach, supra* at 1248; *Marchese, supra* at 188.

I disagree with the majority's proposition that the chief need not have conducted a "separate but parallel investigation" to any done by the city attorney, counsel retained by the city, or other unspecified management personnel. Any "investigation" conducted by defense counsel in this case was in preparation for litigation and differs substantively from a police investigation into unconstitutional conduct. Moreover, there was simply no evidence presented that a serious investigation was conducted by *anyone* in this case or that anyone else advised the chief whether an investigation should be conducted. The chief testified that the existence of a lawsuit absolutely did not preclude him from conducting an internal investigation into potential police misconduct. Therefore, it appears that the chief retained ultimate decision-making authority over investigative matters and did not delegate responsibility to others to conduct an investigation in this case. If the chief wished to rely on an investigation conducted by someone outside his department, he did so at his own risk and that of the city. See *Rushing, supra* at 277-279.

I believe that not only was the police chief not precluded from investigating, but that he had a continuing duty to investigate even after the lawsuit was filed. See *Marchese, supra* at 188 (although the sheriff knew nothing about incidents of excessive force until

shortly before trial and conducted no investigation, the sheriff was sued in his official capacity and in that capacity he had a *duty to both know and to act* to investigate to discover and discipline the offending officers). Accord, *Leach, supra* at 1248. Although *Canton* was decided after *Marchese*, the case of *Leach*, which relied in part on *Marchese*, was decided after *Canton*. In *Leach*, the Sixth Circuit Court of Appeals utilized *Canton* as its guide in determining *Leach*, affirmed the continuing viability of the proposition in *Marchese* that a commanding officer has a duty to both know and to act, and, further, determined in accordance with *Marchese* that where the commanding officer failed to investigate claims of mistreatment his inaction constituted ratification sufficient to attach liability. *Leach, supra* at 1247-1248. The Supreme Court denied certiorari for both *Leach*, 495 US 932 (1990), and *Marchese*, 480 US 916 (1987). In any event, it cannot be said that an "omniscient duty to know and to act" was imposed on Chief Shulhan where he admitted that he knew from the preliminary complaint report that force was used by the officers and where he received notification via the lawsuit of Anthony Sudul's injuries and Sudul's claim of excessive force, but where he made a deliberate choice not to investigate the claim of police misconduct.

Regarding the information that he did obtain, Chief Shulhan testified that, although he read the preliminary complaint report, spoke with the arresting officer, and read a synopsis of some of the police officers' depositions, he did not read any of the plaintiffs' depositions, nor did he speak with any of the plaintiffs, the neighbors, or other witnesses to the

incident. The court in *Fiacco, supra* at 331, determined that a jury could infer deliberate indifference by a city to the use of excessive force where the police chief's one-sided "investigation" was likewise limited to questioning the accused officers.

As a result of Chief Shulhan's limited inquiry, the instant jury, like the jury in *Fiacco*, "was free to reason that the very failure of the City defendants to conduct a nonsuperficial investigation into civilian claims of excessive force indicated that the City and the chief simply did not care what a thorough investigation would reveal, that they were indeed indifferent to whether or not excessive force was used." *Fiacco, supra* at 331. The chief's decision, because he was the authorized decisionmaker, not to investigate constituted a "deliberate choice from among alternatives," represented an act of official government policy, and constituted ratification of the illegal acts of excessive force such that liability may be imposed on the police chief and, hence, the city. *Canton, supra* at 396 (O'Connor, J., concurring in part and dissenting in part); *Pembaur, supra* at 481-482; *Leach, supra; Marchese, supra.*

As Justice Brickley, speaking for the majority in *Rushing, supra* at 267, stated, "[t]he very notion of deliberate *indifference* contemplates a *failure* to act when the need to do so is obvious" (emphasis in original). In considering the evidence in a light most favorable to plaintiff as analyzed under current legal principles, the evidence was sufficient in this case to permit a rational jury to find that the police chief's failure to enforce the policies and failure to investigate amounted to deliberate indifference to Anthony Sudul's Fourth Amendment right not to have exces-

sive force used against him. The majority may beg to differ, but that is not the standard by which this issue is to be decided. *Rushing, supra* at 268. Defendants' arguments and the majority's conclusion that the city's response to claims of excessive force was appropriate are matters properly left to the jury. A directed verdict in favor of defendants with regard to plaintiff's claim of municipal liability under 42 USC 1983 is inappropriate in this case whether based upon the law or based upon the facts.

As a final note, the majority questions the continuing viability of the "single incident rule" enunciated in *Pembaur.* Although Justice O'Connor's opinion in *Canton, supra* at 397-400, which was joined by Justices Scalia and Kennedy, calls into question whether a single incident could support municipal liability, the single incident rule is still the current law. I do not disagree with the majority that municipal liability was improperly imposed in *Brown v Bryan Co*, 67 F3d 1174 (CA 5, 1995), cert gtd sub nom *Bryan Co Bd of Co Comm'rs v Brown*, ___ US ___; 116 S Ct 1540; 134 L Ed 2d 645 (1996), on a classic respondeat superior basis. However, the dissent in *Brown* did not disagree that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances, citing *Pembauer, supra* at 480, but determined that the facts in *Brown* did not constitute such a circumstance. I agree. In *Brown*, it was *not* alleged that the sheriff failed to investigate the unconstitutional conduct at issue (wherein a deputy purportedly used excessive force and was found liable for false arrest and false imprisonment), but rather that the sheriff made a bad decision in hiring the deputy without doing an adequate background check on

him. The instant police chief's failure to investigate the unconstitutional behavior, which is not present in *Brown*, is deemed to be acquiescence in or ratification of the unconstitutional behavior by which municipal liability may attach. Ratification of unconstitutional conduct was simply not implicated in *Brown* and therefore those principles were not discussed in that case.

### CHALLENGE TO JUROR

Defendants next assert that the trial court abused its discretion in refusing to dismiss for cause a juror whose religious beliefs, defendants claim, prevented her from sitting as a juror. Again I disagree.

In order for a party to seek relief from a trial court's refusal to dismiss a challenged juror for cause,

> there must be some clear and independent showing on the record that: (1) the court improperly denied a challenge for cause, (2) the aggrieved party exhausted all peremptory challenges, (3) the party demonstrated the desire to excuse another subsequently summoned juror, and (4) the juror whom the party wished later to excuse was objectionable. [*Poet v Traverse City Osteopathic Hosp*, 433 Mich 228, 241; 445 NW2d 115 (1989).]

The Court in *Poet* indicated that the decision whether the trial court improperly denied a challenge for cause should be made in accordance with whether the juror is excusable per se under MCR 2.511(D). *Poet, supra* at 241, n 13. The pertinent subsection of the court rule states that it is a ground for a challenge for cause if the person "has opinions or conscientious scruples that would improperly influence the person's verdict." MCR 2.511(D)(5).

During voir dire, the potential juror indicated that she had been a Jehovah's Witness for twenty years and that she really could not say that she had "much faith in the judicial system and it really being fair because [she] believe[d] that, you know, only God can really bring about true justice for mankind, for everybody." The judge questioned her as follows:

> *Q*: Do you understand that you're not asking to judge these people, just the facts in this case, not the individuals themselves; do you understand that?
>
> *A*: Yes, I do.
>
> *Q*: And you believe that your religion prevents you from doing that?
>
> *A*: Not necessarily that but just the way that I feel about, you know true justice.
>
> *Q*: Can you sit with us in our imperfect justice here and be fair and impartial? Can you do that?
>
> *A*: Yes, probably.
>
> *Q*: Okay, and you would render a judgment?
>
> *A*: Yes.

The trial court denied defense counsel's request to remove this juror for cause, and defense counsel subsequently used a peremptory challenge to dismiss this juror.

I agree with the trial court's determination that the juror did not indicate that her conscientious beliefs would prevent her from fairly and impartially deciding the facts and rendering a verdict in the case. MCR 2.511(D)(5). See *People v Lee*, 212 Mich App 228, 249-250; 537 NW2d 233 (1995). The juror's statements were not equivalent to a "biased or prejudicial state of mind." *Poet, supra* at 236. Further, no prejudice was established because the juror was dismissed

peremptorily and defendants still had a peremptory challenge left when the jury was impaneled.

EVIDENTIARY ISSUES

Defendants' argument is waived regarding plaintiffs' subpoena, on the first day of trial, of the city's personnel records relating to other incidents involving the city's police officers. The record does not reflect that defendants challenged the subpoena of records pursuant to MCR 2.506(H)(1); *People v Tomko*, 202 Mich App 673, 679; 509 NW2d 868 (1993).

A. NOLO CONTENDERE PLEA

Before to the instant trial, plaintiff Anthony Sudul entered a plea of nolo contendere to a charge of fleeing and eluding the police. In opposition to plaintiff's motion in limine to preclude evidence of the plea, defendants argued, as they do on appeal, that they were entitled under MRE 410 to admit plaintiff's nolo contendere plea and to show why plaintiff was arrested, that the arrest was lawful, and that the plea was entered in exchange for a dismissal of a resisting arrest charge. The trial court determined that admission of the plea was irrelevant because resisting arrest charges were never filed and plaintiff was not contesting the lawfulness of the arrest. The court precluded evidence of the nolo contendere plea.

Under MRE 410(2), evidence of a plea of nolo contendere is inadmissible in a civil proceeding except to support a defense against a claim asserted by the person who entered the plea. In this case, plaintiffs did not claim that the arrest for fleeing and eluding was unlawful, and the trial court specifically instructed the jurors that they were to assume that the arrest

was lawful. Therefore, evidence of the plea of nolo contendere was inadmissible because it was not relevant to any point in issue. MRE 402.

### B. ALLEGATIONS OF OTHER INCIDENTS INVOLVING HAMTRAMCK POLICE OFFICERS

Defendants assert the trial court erred in denying defendants' motion in limine to exclude evidence of allegations in other cases of possible excessive force by Hamtramck police officers. Defendants argue that the allegations constituted hearsay, were irrelevant, were dissimilar from the instant case, and were more prejudicial than probative. I disagree. The evidence of other incidents tended to show that other alleged acts of improper force were not investigated. Therefore, the evidence was relevant and admissible to show a custom or policy of deliberate indifference by the city in failing to investigate incidents of excessive force. MRE 402. See *Oklahoma City v Tuttle, supra*, 471 US 824.

### C. TRAFFIC ACTIVITY LOG

Defendants' claim that they were unduly prejudiced when plaintiffs were allowed to pursue a line of questioning regarding the revenue the arresting officer generated for the city while on traffic duty on the date of the incident is without merit. The officer's activity log had previously been admitted without objection. Even if the question to the officer regarding his traffic revenues was irrelevant, any error was harmless because the information was contained within the traffic activity log, which was admitted without objection. MCR 2.613(A).

### D. MORTALITY TABLES

Defendants are not entitled to a new trial because mortality tables were mistakenly given to the jury during its deliberations. Upon realizing the mistake, the court removed the tables from the jury and gave it a cautionary instruction that it was not to consider the numbers on the table other than the 26.11 years' life expectancy the jury was given during the court's instruction to the jury. There were no objections by counsel.

"The consideration of documents that are not admitted into evidence but are submitted to the jury does not constitute error requiring reversal unless the error operated to substantially prejudice the party's case." *Phillips v Deihm, supra,* 213 Mich App 402. The tables in the jury room contained the same information that the court had given to the jury in its instructions. Defendants have not established that anything unfairly prejudicial to defendants was on the tables or that submission of this evidence to the jury substantially prejudiced their case. *Id.*

Defendants are not entitled to a new trial on the basis of evidentiary errors in this case.

### ANTHONY SUDUL'S MENTAL HEALTH TREATMENT

At trial, Teresa Sudul testified that Anthony Sudul had been undergoing treatment at a mental health facility during the two months before trial. Anthony Sudul testified that he had gone for psychiatric treatment a few times after the incident, but denied that he was currently being treated. As they did in their motion for a new trial, defendants assert on appeal that Anthony Sudul's failure to supplement his answers to interrogatories to inform defendants of

the treatment and his sworn denial of further medical treatment severely prejudiced defendants and constituted a fraud upon the court, warranting a new trial.

A new trial may be granted on all or some of the issues when the substantial rights of a party were materially affected and there was fraud or misrepresentation by an adverse party. MCR 2.612(C)(1)(c). Whether to grant a new trial is in the trial court's discretion, and its decision will not be reversed absent a clear abuse of that discretion. *People v Herbert*, 444 Mich 466, 477; 511 NW2d 654 (1993). However, I am unable to determine on what basis the trial court decided this issue because defendants have failed to provide a transcript of the hearing concerning their motion for a new trial as required by MCR 7.210(B)(1)(a).

Perjury is an intrinsic fraud, and while it constitutes fraud in obtaining a judgment, it does not prevent an adversary trial on significant issues so as to necessitate relief from judgment. *Stallworth v Hazel*, 167 Mich App 345; 421 NW2d 685 (1988). There is no record evidence of which this Court is aware, supplied either during or after the trial, that Anthony Sudul in fact perjured himself. It very well could be that Teresa Sudul was mistaken in her belief that Anthony was going to a mental health center. However, even if Anthony Sudul did testify falsely in this regard, defendants were apparently successful in raising questions in the jury's mind whether he suffered psychological injury because the jury found that defendants were not liable for mental health claims by Anthony Sudul and did not award damages to him on this basis. Substantial rights of defendants were not materially affected. MCR 2.612(C)(1)(c).

CLOSING ARGUMENTS

During closing arguments, plaintiffs' counsel commented that the officer who stopped Anthony Sudul for the traffic violation and subsequently arrested him was "sitting out there in a speed trap generating money." Defendants argue that plaintiffs deliberately injected the false issue of the amount of money generated for the city by traffic tickets into the trial in order to appeal to the jury's bias and prejudice. However, defendants did not preserve this issue for appeal by challenging the statement below either at the time it was made or during their subsequent motion for a new trial. *Thorin v Bloomfield Hills Bd of Ed*, 203 Mich App 692, 704; 513 NW2d 230 (1994). Consequently, this issue is waived.

Defendants further claim that plaintiffs' counsel deliberately, impermissibly, and irremediably prejudiced the jury by personally involving the jurors in his final argument when he argued:

> You're dealing with the abuse of police power. The animal is the same and only juries can corral this animal when the police departments don't; when the government doesn't. Only juries can say this is the standard that we want in this community. This is what we will not allow from any police officers. Juries draw those lines.

At this point defense counsel interrupted, a bench conference was held off the record, no objections were placed on the record, and no cautionary instruction was requested or given.

Plaintiffs' counsel's comments are distinguishable from those made in *Hatten v Bane*, 16 Mich App 10; 167 NW2d 466 (1969), and *Kakligian v Henry Ford Hosp*, 48 Mich App 325; 210 NW2d 463 (1973), relied

on by defendants on appeal. In *Hatten, supra* at 11, the defense counsel argued that if the plaintiff were awarded damages, "the consumer," that is, the jurors, would pay. In the instant case, plaintiffs' counsel argued in essence that in the trial process the jurors would make the determination of the propriety of the police policies and actions. That determination was the central issue in this case and appropriately involved the jurors. In *Kakligian, supra* at 328, the defense counsel argued that the lawsuit was brought " 'for one thing and one thing only and that is for revenge, and not for anything else.' " This Court concluded that the sole purpose of counsel's argument was to appeal to the jury's bias and prejudice. *Id.* at 329. Counsel in the instant case did not argue that the suit was brought for a particular reason other than to vindicate the rights of plaintiffs.

Finally, defendants take issue with plaintiffs' counsel's comments made during rebuttal arguments:

> You want to talk about someone that has a reason to come in here and prevaricate? You got six police officers who arrested a man for speeding and he looked like that. They had a reason to come in here and get their act together, so that the next time someone looks like that and brings them to Court they can say well, nothing happened to me in the Sudul case. We won that. And it goes on, just like the policy of not taking complaints. The first thing someone suing that department will hear, well show me where a policy is. If they don't take a complaint how can you make a policy? This isn't all incidental. This happens. This goes on all the time, and anybody who's been in the city knows it goes on.

At this point defense counsel objected that there was no evidence of this on the record, and the court

sustained the objection. Defense counsel requested no cautionary instruction, and the court gave none.

A review of the rebuttal comments reveals that they were made in response to defense counsel's arguments that plaintiffs "embellished" the facts, were liars, and "manipulated [their] recollection to suit this case" and that there were only six alleged excessive force cases in the last five years, in which four of the officers involved were exonerated. As a response to closing arguments made by defense counsel, the comments were proper. See, e.g., *People v Vaughn*, 200 Mich App 32, 39; 504 NW2d 2 (1993).

### VERDICT FORM

Defendants raise numerous claims of error regarding each question on the special verdict form submitted to the jury. However, defendants did not timely object to the special verdict form before its submission to the jury for deliberations. See MCR 2.514; *Hammack v Lutheran Social Services of Michigan*, *supra*, 211 Mich App 10. I disagree that the special verdict form should provide any basis for reversal in this case where three separate defense counsel deemed the verdict form proper at trial. *People v Barclay*, 208 Mich App 670, 673; 528 NW2d 842 (1995).

### CONCLUSION

I would reverse and remand for a new trial Anthony Sudul's claim of assault and battery; the jury's award of $20,000 in compensatory damages for the assault and battery would therefore have to be vacated. However, I would affirm the jury verdict and the judgment in all other respects.